**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2755-17T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

QUINNIZEL J. CLARK,

    Defendant-Appellant.

_____

Argued October 7, 2020 – Decided December 1, 2020

Before Judges Fuentes, Rose, and Firko (Judge Rose concurring in part and dissenting in part).

On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Indictment No. 17-01-0033.

Daniel S. Rockoff, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Daniel S. Rockoff, of counsel and on the briefs).

Valeria Dominguez, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Kayla E. Rowe, Deputy Attorney General, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant Quinnizel J. Clark appeals from a judgment of conviction for murder and unlawful possession of a weapon and the life sentence imposed by the trial court. Based on our review of the record in light of applicable law, we are convinced that the cumulative effect of errors committed during the trial rendered the trial unfair. Accordingly, we reverse defendant's conviction, vacate his sentence, and remand for further proceedings.

I.

These are the facts adduced at trial. Defendant and the victim, sixty-eight-year-old James Dewyer, who was physically disabled and homeless, were acquaintances who knew each other from a circle of individuals who stayed at the Riverfront Motel located on Route 130 in Mansfield Township and gambled together. Defendant resided at the Riverfront Motel, a state-run low-income shelter. Dewyer was a retired corrections officer with a substantial pension and was known to give rides and spend time with individuals living at the Riverfront Motel. Dewyer was defendant's gambling companion, and defendant called him "Jimmy Dean." Both men enjoyed betting horse races.

A-2755-17T1

On January 3, 2016, at approximately 4:17 p.m., Sergeant Daniel Pachuta of the Mansfield Township Police Department responded to a 9-1-1 call made from Kinkora Road between Stratton Avenue and Third Street on a one-hundred-foot-long unfinished side street called Monica Drive. Sergeant Pachuta arrived at the location and met the caller, Dan Michal, who pointed to a parked vehicle facing the woods. Michal testified that he approached the vehicle and saw a man, later identified as Dewyer, inside with his head slumped as if he was "drunk" or "sleeping."

Sergeant Pachuta approached the vehicle and saw Dewyer in an upright position in the passenger seat facing forward wearing his seatbelt but unresponsive to attempts to get his attention. Dewyer was warm to the touch but had no pulse and was not breathing. When paramedics arrived and lifted Dewyer out of the car seat, blood poured out of a wound to his abdomen. Dewyer never regained consciousness. Paramedics informed Sergeant Pachuta that Dewyer was shot multiple times.

At trial, the medical examiner testified Dewyer sustained a prominent gunshot wound on his left side underneath his ribs. Five bullets created three overlapping entrance wounds, which left a large hole in the side of Dewyer's body. Near his underarm was a "two-and-a-half-inch zone of dense gunpowder

stippling and soft tissue abrasion," meaning the gun "was stuck into Dewyer's side and touching it when it was discharged." In addition, the medical examiner testified that Dewyer had used heroin within thirty minutes of his death. The officers concluded that three cartridges found inside the vehicle were all fired from the same weapon. However, the weapon was never recovered.

Investigator Tim Horne from the Burlington County Prosecutor's Office took over the case and collected evidence, including Dewyer's wallet containing his driver's license, his retirement credentials, a one-dollar bill, and a Delaware Park Casino betting ticket from the morning stamped 9:52 a.m. Several officers went to the casino and obtained video footage depicting Dewyer. The footage also showed a black male, later identified as defendant, buying the betting ticket and handing it to Dewyer. The investigator also found a Burlington County Jail bail receipt in Dewyer's glove compartment box, indicating Dewyer had posted $1500 bail for defendant on October 30, 2015.

Video footage obtained from the Riverfront Motel, where defendant was registered, showed Dewyer arriving in his vehicle at 7:00 a.m. on the day of the murder. Defendant emerged from a residential area at 7:08 a.m., and the two drove away. They arrived at the casino at 8:34 a.m. as confirmed by video footage. At 11:01 a.m., defendant and Dewyer left the casino and returned to

the Riverfront Motel at 12:21 p.m. in Dewyer's vehicle, a silver Dodge Avenger. Defendant drove Dewyer's vehicle because Dewyer complained of leg pain. After returning to the Riverfront Motel, Dewyer remained in his vehicle and smoked a cigarette while defendant went to his room for about an hour. At 1:34 p.m., defendant placed a backpack on the back seat, and the two drove away.

On January 13, 2016, officers interrogated defendant. In a recorded statement, defendant told the officers that on January 3, 2016, around 1:00 p.m. to 1:30 p.m., Dewyer dropped him off in the Roebling section of Florence because defendant had to complete a transaction in that area. Defendant thought Dewyer planned to pick up young women afterwards, something that he "always" did. According to defendant, he walked back to the Riverfront Motel in twenty or thirty minutes after he completed his transaction in Roebling.

Video footage from the Riverfront Motel showed defendant returning at 3:37 p.m. with an unidentified woman. They left together in a vehicle shortly thereafter, and defendant returned alone eight minutes later at 3:45 p.m. Defendant had the backpack he carried when he entered Dewyer's vehicle earlier that morning. Dewyer was not with defendant and the woman. When officers pressed defendant for an alibi, he repeatedly requested assistance of counsel, but his request was not heeded.

A-2755-17T1

The surveillance footage from the Riverfront Motel showed defendant wearing dark blue jeans with white sneakers and a light-colored long sleeve shirt when he and Dewyer returned from Delaware. Later in the afternoon, defendant was depicted on surveillance footage wearing a dark colored hoodie. When he returned to the motel at 3:28 p.m., he was still wearing a dark colored hoodie, dark pants, and white sneakers.

Although defendant told law enforcement officers that he was in Roebling, surveillance footage reviewed by the officers did not bear out his claim. When questioned about where he was after leaving the Riverfront Motel, defendant could not provide an alibi. Defendant simply told investigators that Dewyer dropped him off in Roebling because he had something to do there.

On January 18, 2017, defendant was charged under indictment number 17-01-0033 with first-degree murder, N.J.S.A. 2C:11-3(a)(1) and 2C:11-3(a)(2) (count one); second-degree possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1) (count two); and second-degree unlicensed possession of a handgun, N.J.S.A. 2C:39-5(b)(1) (count three).

Prior to trial, defendant moved first to suppress his July 8, 2016 statement and later to suppress his January 13, 2016 statement to the police. Defendant argued that his January 13, 2016 statement should be suppressed because he was

6

effectively under arrest at the time of interrogation, and the failure of the officers to inform him of his custodial status impacted a knowing, voluntary, and intelligent waiver of his Miranda[1] rights. The trial court previously denied defendant's motion to suppress his July 8, 2016 statement, noting in an oral decision that it's "[seventy-four] pages of denial" and "wouldn't harm the defendant."

In a written memorandum and order, the trial court also denied defendant's motion to suppress his January 13, 2016 statement. At the time of his interrogation on January 13, 2016, there was an outstanding municipal warrant for defendant's arrest, which police did not disclose prior to questioning him. Before the interrogation began, the police informed defendant, "You're not under arrest, but it's a murder investigation." Defendant consented to the interrogation. However, when the interrogation ended, the officers arrested defendant on the outstanding municipal warrant. The trial court concluded that "the decision of the police to withhold information about the outstanding municipal warrant had no bearing on defendant's knowing, voluntary and intelligent waiver of his rights."

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

A-2755-17T1

During the subsequent jury trial, the State presented two pieces of evidence to challenge defendant's claim that he left Dewyer in Roebling. Sandra and Jeffrey Carver testified that at 2:30 p.m. on January 3, 2016, they drove their tractor past a man walking along Kinkora Road where Dewyer was found dead. The Carvers noticed a silver car pulled to the side of an unfinished road between Second and Third streets. They slowed down and saw a man walking up Kinkora Road. Sandra[2] described a "large, tall" man, "over six f[ee]t and over 200 pounds," "in blue jeans," carrying a "black" backpack, and possibly wearing a "red," "orange," or "yellow" hoodie. She further testified that the man "definitely was not black," but "could have been a mix."[3]

Jeffrey testified that the man wore "dark pants," a "dark jacket," a "black backpack" with a "silver trim," and "a little bit of red or bright color around the neck area," or "red and white," possibly from a "hooded sweatshirt." According to Jeffrey, the man's "skin coloring was a light tan. He wasn't a white person." After loading their tractor onto their pickup truck, the Carvers stopped to see if

---

[2] Because these two witnesses have the same last name, we will refer to them by their first names. We do not intend any disrespect.

[3] We recognize the word "mix" in this context may be considered offensive or racially insensitive. We have nevertheless decided to quote the witness' testimony verbatim in the interest of clarity.

anyone was inside the oddly parked silver car. They did not notice anyone in the silver car and went home. The Carvers never identified defendant in court or from a photo array, or in any other type of identification procedure. Nonetheless, during his summation to the jury, the assistant prosecutor argued that based upon the Carvers' "description," the person they saw that day "was the defendant."

The State also presented other witnesses, including John Hauger, an FBI special agent, who was qualified and admitted, without objection, as an expert witness "in the area of cellphone technology, cell cite analysis and cellular records analysis." Hauger testified about defendant's historical cellular site data on the day of the murder. Defendant voluntarily gave his cellphone number to the investigating officers. After reviewing defendant's cellphone records, Hauger opined that between 2:06 p.m. and 3:09 p.m., defendant's cellphone was in a cellular coverage area that encompassed the crime scene. Of the twenty-three calls and text messages made from defendant's cellphone on the afternoon in question, Hauger concluded "none" were "made in the section that included Kinkora Road and the crime scene," and "none" were "generated in Roebling."

A Riverfront Motel resident, Charlene Rivera, overheard a conversation between defendant and Dewyer a few weeks before the murder. According to

Rivera, she heard the two men "hollering and screaming" about money in front of her motel room door. Rivera also testified that she gave Dewyer coffee before he and defendant left for the casino, and she gave Dewyer lunch when they returned at 12:21 p.m. She testified the two appeared "friendly" and "normal."

Nancy Cristinzio, another Riverfront Motel resident, testified that Dewyer lived in his vehicle, but was at the motel on a daily basis giving rides to residents. Cristinzio and Rivera both denied ever seeing defendant with a firearm. But Cristinzio heard defendant talking about a firearm in the several weeks preceding Dewyer's murder. Cristinzio testified that defendant asked Dewyer to retrieve a firearm from room number eleven, and Dewyer refused to do so. At least part of the time, defendant resided in room eleven. Defendant did not testify at trial.

During his summation to the jury, the prosecutor referred to the video recording from the casino, depicting defendant and Dewyer, in a manner intended to malign defendant's character:

> Now, [defendant] acknowledges James Dewyer has these bad legs, he could hardly get around. But does his good friend, Quinnizel Clark, drop [Dewyer] off at the front door of that casino? No, he goes and parks, gets out of the car, leaves [Dewyer] in the car, walks into the casino, is gambling for a period of time and then finally you see [Dewyer] come walking out. He doesn't try to help him into the casino. He doesn't try

10

to walk with him. He doesn't stay with him. He's not his friend. He's using him.

Without any evidential basis in the record, the prosecutor then told the jury that defendant changed his clothes when he arrived at the Riverfront Motel the afternoon of the murder to avoid identification. The prosecutor argued: "Well, why in that short nine minute period of time does he have to change clothes? Well, I submit to you, he just killed somebody and he's trying not to be seen in the same clothing so he can't be identified."

Then, without defendant having the benefit of counsel at the time he gave his recorded statement, the prosecutor argued to the jury:

> You heard his statement, when he tells Detective Raynor he's down there doing business in Roebling, <u>Detective Raynor practically begged him, well, who you were with, tell us you're with, we'll go out, track it down and talk to this person. No, I'm not gonna tell you who I was with</u>.

[Emphasis added.]

The jury convicted defendant of murder, second-degree possession of a handgun for an unlawful purpose, and second-degree unlawful possession of a handgun. The sentencing judge imposed life imprisonment subject to the requirements of the No Early Release (NERA), N.J.S.A. 2C:43-7.2. This appeal followed.

## II.

Defendant's counsel presents the following arguments for our consideration:

POINT I

THE COURT ERRED BY NOT GIVING ANY IDENTIFICATION INSTRUCTION AFTER THE PROSECUTOR ARGUED THAT EYEWITNESSES SAW [DEFENDANT] AT THE HOMICIDE SCENE. (Not Raised Below).

1. THE PROSECUTOR'S THEORY AT TRIAL WAS THAT, DESPITE THE DEFENDANT'S DENIAL, EYEWITNESSES SAW HIM AT THE CRIME SCENE.

2. THE COURT FAILED TO INSTRUCT JURORS THAT THE PERPETRATOR'S IDENTITY WAS AKIN TO AN ELEMENT WHICH THE STATE HAD THE BURDEN OF PROVING BEYOND A REASONABLE DOUBT.

3. THE COURT FAILED TO INSTRUCT JURORS ON ESTIMATOR VARIABLES, WHICH WERE ESSENTIAL TO EVALUATING THE RELIABILITY OF THE EYEWITNESS TESTIMONY.

4. THE COURT'S FAILURE TO ADMINISTER ANY IDENTIFICATION INSTRUCTION WAS CLEARLY CAPABLE OF CAUSING AN UNJUST RESULT.

POINT II

THE COURT ERRED BY ADMITTING AN FBI AGENT'S OPINION THAT CELLPHONE LOCATION DATA WAS INCULPATORY.

1. THE CELLPHONE LOCATION DATA SHOULD HAVE BEEN SUPPRESSED, BECAUSE IT WAS THE POISONED FRUIT OF INTERROGATORS' FAILURE TO HONOR THE DEFENDANT'S UNEQUIVOCAL INVOCATION OF HIS RIGHT TO COUNSEL.

2. AS IN STATE V. CARRERA,[4] AN FBI AGENT'S OPINION DISPARAGING THE DEFENSE SHOULD HAVE BEEN EXCLUDED AS UNRELIABLE. THE AGENT FAILED TO FOLLOW BEST PRACTICES, AND IMPARTIAL EVIDENCE CONTRADICTED HIM.

3. BECAUSE THE STATE COULD NOT PROVE THAT THE DEFENDANT TOOK THE PHONE WITH HIM WHEN HE LEFT THE MOTEL, THE CELLPHONE EVIDENCE WAS NOT PROBATIVE OF THE DEFENDANT'S

---

[4] State v. Richard Carrera, A-5486-16 (App. Div. Aug. 26, 2019) (slip. op.), is an unpublished opinion. Pursuant to Rule 1:36-3, "no unpublished opinion shall constitute precedent or be binding upon any court." Unreported decisions "serve no precedential value, and cannot reliably be considered part of our common law." Trinity Cemetery v. Wall Twp., 170 N.J. 39, 48 (2001) (Verniero, J. concurring).

13

LOCATION, AND SHOULD HAVE BEEN EXCLUDED.

4. THE COURT ALSO ERRED BY ADMITTING THE FBI AGENT'S MISLEADING BLOWN-UP MAP IN SUPPORT OF HIS OPINION TESTIMONY.

5. THE PREJUDICIAL IMPACT OF THE FBI AGENT'S OPINION WAS CLEARLY CAPABLE OF CAUSING AN UNJUST RESULT.

POINT III

THE COURT ERRED BY LETTING JURORS HEAR, WITHOUT ANY LIMITING INSTRUCTION, THAT THE DEFENDANT EXERCISED HIS RIGHTS TO COUNSEL, BAIL, AND THE KEEPING OF A FIREARM IN THE HOME. (Not Raised Below).

1. THE COURT ERRED BY ADMITTING EVIDENCE, WITHOUT ANY LIMITING INSTRUCTION, THAT THE DEFENDANT INVOKED HIS FIFTH AMENDMENT RIGHT TO COUNSEL WHEN INTERROGATORS ASKED HIM ABOUT HIS ALIBI.

2. THE COURT ERRED BY ADMITTING EVIDENCE, WITHOUT ANY LIMITING INSTRUCTION, THAT THE DEFENDANT HAD PREVIOUSLY BEEN INCARCERATED AND WAS OUT ON BAIL AT THE TIME OF THE OFFENSE.

14

3. THE COURT FAILED TO INSTRUCT THE JURY THAT IT IS LEGAL TO KEEP EVEN AN UNLICENSED FIREARM IN ONE'S OWN RESIDENCE.

POINT IV

A RESENTENCING REMAND IS REQUIRED BECAUSE THE COURT IMPOSED A LIFE TERM WITHOUT EXPLAINING WHY THE [THIRTY]-YEAR STATUTORY MINIMUM WOULD NOT SUFFICE.

In his pro se supplemental brief, defendant presents the following arguments:

POINT I

PROSECUTION COMMITTED MISCONDUCT AND BRADY[5] VIOLATION BY FAILING TO PROVIDE AUDIO TRANSCRIPTS OF ALL WITNESSES TO THE DEFENSE. TRIAL COURT ERRED IN ADMITTING WITNESS TESTIMONY OF NANCY CHRISTINZIO AND CHARLENE RIVERA, WHERE THE DEFENSE HAD NOT RECEIVED THEIR TRANSCRIPTS. TRIAL COURT ERRED IN ALLOWING THE PROSECUTION TO VIOLATE SEVERAL N.J. COURT RULES WHICH CAUSED A MANIFEST DENIAL OF JUSTICE UNDER THE LAW.

POINT II

TRIAL COURT ERRED BY FAILING TO BASE RULINGS "ON THE LAW" AND "ON THE FACTS."

---

[5] Brady v. Maryland, 373 U.S. 83 (1963).

A-2755-17T1

TRIAL COURT ERRED IN BASING RULINGS OFF OF FACTS NOT IN EVIDENCE. TRIAL COURT ERRED IN ABUSING ITS DISCRETION.

POINT III

TRIAL COURT ERRED BY ABUSING ITS DISCRETION WITH BIASED AND HIGHLY PREJUDICIAL STATEMENTS THAT DENIED THE DEFENDANT A FAIR TRIAL.

POINT IV

TRIAL COURT ERRED VIOLATING DEFENDANT'S FIFTH, SIXTH, AND FOURTEENTH AMENDMENT RIGHTS GUARANTEED BY THE UNITED STATES CONSTITUTION.

Defendant challenges his conviction based on numerous claims concerning alleged errors by the trial court, most of which were not raised before the trial court. Therefore, unless otherwise noted, we consider the alleged errors under the plain error standard. R. 2:10-2. "'A defendant who does not raise an issue before a trial court bears the burden of establishing that the trial court's actions constituted plain error'" because "'to rerun a trial when the error could easily have been cured on request[] would reward the litigant who suffers an error for tactical advantage either in the trial or on appeal.'" State v. Santamaria, 236 N.J. 390, 404-05 (2019) (quoting State v. Ross, 229 N.J. 389, 407 (2017)).

Under the plain error standard's "high bar," id. at 404, "[w]e may reverse . . . only if the error was 'clearly capable of producing an unjust result,'" Ross, 229 N.J. at 407 (quoting R. 2:10-2). "The possibility of an unjust result must be 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" Ibid. (quoting State v. Williams, 168 N.J. 323, 336 (2001)).

Although we are compelled to assess most of defendant's arguments under the plain error standard, we must also consider the cumulative effect these errors had on defendant's fundamental right to a fair trial. State v. Jenewicz, 193 N.J. 440, 473 (2008). In doing so, we must determine whether "the probable effect of the cumulative error was to render the underlying trial unfair," State v. Wakefield, 190 N.J. 397, 538 (2007), thereby "dictat[ing] the grant of a new trial before an impartial jury." Ibid. (quoting State v. Orecchio, 16 N.J. 125, 129 (1954)).

For the first time on appeal, defendant contends the trial court erred by not giving an identification instruction after the prosecutor presented evidence and argued in summation that the Carvers saw defendant at the crime scene. More particularly, defendant argues the State had the burden of proving the perpetrator's identity beyond a reasonable doubt but instead convicted him on

17

purely speculative proofs in violation of his Fifth, Sixth, and Fourteenth Amendment rights. U.S. Const. Amends V, VI, and XIV and N.J. Const. Art. I, para.10.

Defendant further asserts the prosecutor reinforced the notion that the Carvers saw him at the homicide scene when in fact no identification procedure ever took place during the course of the investigation, and no in-court identification of defendant was made. The Carvers merely testified in a general manner about their observations of a man they saw on the day in question near the murder scene. The prosecutor noted in his summation that there were no eyewitnesses to Dewyer's murder but defendant was the man the Carvers saw based on the timeline defendant provided, his lack of cellphone activity at that time, and what the Carvers said they saw about a man matching defendant's description.

"[I]f the defendant does not object to the charge at the time it is given [. . .] there is a presumption that the charge was not error and was unlikely to prejudice [his] case." State v. Singleton, 211 N.J. 157, 182 (2012) (citing State v. Macon, 57 N.J. 325, 333-34 (1971)). The appellate court reviews the jury charge for plain error and evaluates the charge as a whole. State v. Mann, 132 N.J. 410, 417-18 (1993). Model Jury Charges (Criminal) "Identification: No In-

or Out-of-Court Identification" (approved October 26, 2015) provides for a jury instruction when defendant's defense is that he or she did not commit the crime, and the State is seeking to prove his or her guilt without adducing direct identification evidence:

> (Defendant), as part of his/her general denial of guilt, contends that the State has not presented sufficient reliable evidence to establish beyond a reasonable doubt that he/she is the person who committed the alleged offense. The burden of proving the identity of the person who committed the crime is upon the State. For you to find this defendant guilty, the State must prove beyond a reasonable doubt that this defendant is the person who committed the crime. The defendant has neither the burden nor the duty to show that the crime, if committed, was committed by someone else, or to prove the identity of that other person. You must determine, therefore, not only whether the State has proven each and every element of the offense charged beyond a reasonable doubt, but also whether the State has proven beyond a reasonable doubt that this defendant is the person who committed it.

Here, the trial court explained the difference between direct and circumstantial evidence to the jurors and that they should carefully scrutinize any circumstantial evidence. Further, the trial court explained the elements of murder the State had to prove beyond a reasonable doubt "that the defendant caused [Dewyer's] death" and "the defendant did so purposely or knowingly." Defense counsel agreed to the jury charge and acknowledged she had no

objections. Nonetheless, we are concerned that the Carvers' testimony was impermissibly suggestive and prejudicial to defendant, and the jury may have erroneously drawn a conclusion that he was the perpetrator.

Although not briefed by the parties, we are convinced that on remand, the trial court should conduct a Rule 104(a) hearing outside the presence of the jury as to the admissibility of Sandra and Jeffrey Carver's testimony.[6] Indeed, Rule 104(a) provides for a hearing when the admissibility of evidence "is in issue."

A Rule 104(a) hearing addresses "preliminary evidence questions that are the exclusive province of the court . . . ." See Biunno, Current N.J. Rules of Evidence, comment on Rule 104(a) (2020-2021). The matter under review does not fall under the ambit of United States v. Wade, 388 U.S. 218 (1967),[7] because it does not involve show-up identification. Defense counsel did not object to

---

[6] Rule 104 provides in pertinent part: (a) In General.

> (1) The court shall decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible . . .

> (2) The court may hear and determine such matters out of the presence or hearing of the jury.

[7] A Wade hearing is conducted for the purpose of determining whether an out-of-court identification was made in unduly suggestive circumstances and, if so, whether or not any ensuing in-court identification procedure would be fatally tainted thereby. State v. Henderson, 208 N.J. 208, 238 (2011).

A-2755-17T1

admission of the Carvers' testimony at trial. Nonetheless, we conclude that the trial court must conduct a Rule 104(a) hearing to ascertain if the proffered testimony by the Carvers would aid the jury as the trier of fact in deciding the merits of the controversy or whether the Carvers' testimony may cause undue prejudice in the minds of the jurors and should be barred.

If after the Rule 104(a) hearing the trial court finds from the totality of the circumstances that the Carvers' testimony should not be suppressed, and their testimony should be admitted at trial, then the court "should provide appropriate, tailored jury instructions" explaining how the evidence is to be considered. Henderson, 208 N.J. at 289.

III.

Next, defendant argues that in order to challenge his defense that he was never at the crime scene, the prosecutor had special FBI agent Hauger opine that a servicer's data about a cellphone was incriminating. Defendant argues that the trial court erred by admitting Hauger's testimony because (1) law enforcement's knowledge of defendant's cellphone was the fruit of a statement impermissibly taken by the interrogator after he invoked his right to counsel under Miranda; (2) Hauger's testimony was demonstrably unreliable; and (3) the blown-up map supplementing Hauger's opinion was highly misleading.

Defendant provided his cellphone number and cellular service provider to Detective Wayne Raynor after being advised of his rights. With this information, the historical cell site data analysis was obtained and given to Hauger, who in turn explained the concept to the jury. On January 13, 2016, Detective Raynor went to the Riverfront Motel to contact defendant—a person of interest in Dewyer's murder—based on the casino surveillance footage. Defendant agreed to speak with officers at the police station. As they entered the interview room, Detective Raynor advised defendant of his Miranda rights, and asked whether he felt comfortable speaking with them, to which defendant agreed.

Defendant explained how he knew Dewyer and how he was his "gambling buddy." He explained that Dewyer was living at the Riverfront Motel, sleeping in his car, or a nearby truck stop's massage chairs. On January 3, 2016, defendant explained he went with Dewyer to Delaware Parks Casino, as they did every Sunday. Defendant further volunteered that when they returned, Dewyer wanted to go to another casino, but defendant had a date that night and declined to go. Defendant was hesitant about telling detectives about his transaction in Roebling, but detectives reassured him they just wanted

22

information about where Dewyer was at the time so they could figure out what happened to him that day.

Defendant proceeded to inform the detectives he assumed Dewyer took Route 130 to pick up a friend's daughter from a truck stop. After finishing his business in Roebling, defendant returned to the Riverfront Motel and went on his date—dinner at Carlucci's in Delran and ending at the Aloft hotel. After detectives steered the discussion as to what happened with Dewyer, defendant became defensive, stating: "You say it's game over, charge me, call my attorney, Mr. Keesler over here, charge me and let's go. Plain and simple." Defendant reiterated that he wanted his attorney and was arrested on an outstanding municipal warrant for a traffic violation.

The detective searched defendant and asked several basic questions including, "What's your phone?" In reply, defendant provided his cellphone number, which led to Detective Raynor learning defendant's cellphone provider was T-Mobile. On August 29, 2017, defendant moved to suppress his January 13, 2016 statement arguing that police did not inform him he was the target of a homicide investigation or there was an outstanding warrant. Consequently, defendant argued since his statement should be found inadmissible, Hauger's opinion should likewise be barred.

On September 1, 2017, the trial court issued a written decision and aptly noted that defendant did not admit guilt in either statement he gave to police. The court observed that defendant "was informed of the nature and focus of the inquiry, a murder investigation, and expressed a willingness to speak with the police." Defendant was informed he was a suspect and the detectives had no obligation to tell him about a non-existent charge. Moreover, the trial court correctly determined that the case defendant relied upon, State v. A.G.D., 178 N.J. 56 (2003), did not hold that the target of an interrogation must be advised of all outstanding complaints or arrest warrants unrelated to the subject of the interrogation.

Miranda's protection extends only to acts of police officers "reasonably calculated to elicit an incriminating response." State v. Bohuk, 269 N.J. Super. 581, 594 (App. Div. 1994) (quoting State v. Lozada, 257 N.J. Super. 260, 268 (App. Div. 1992)). "To fall afoul of that rule, the defendant's statement must have been the product of police questioning or its functional equivalent." Ibid. Thus, interrogation under Miranda denotes questions, words, or actions by the police that they "should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980) (footnotes omitted).

"[B]ooking procedures and the routine questions associated [with that process] are ministerial in nature and beyond the right to remain silent." Bohuk, 269 N.J. Super. at 593 (second alteration in original) (quoting State v. Mallozzi, 246 N.J. Super. 509, 515 (App. Div. 1991)). "[U]nexpected incriminating statements made by in-custody defendants in response to non-investigative questions by the police without prior Miranda warnings are admissible." Mallozzi, 246 N.J. Super. at 516; see State v. Ward, 240 N.J. Super. 412, 419 (App. Div. 1990) (statements "voluntarily blurted out by an accused in custody where the police have not subjected him to an interrogative technique or where the police are about to begin giving the Miranda warnings are . . . admissible without Miranda warnings."). Thus, the arrest warrant for defendant's traffic violation was immaterial to the Miranda analysis.

We consider whether a question asked by the police is reasonably related to a legitimate administrative concern. State v. Cunningham, 153 N.J. Super. 350, 354 (App. Div. 1977). Our jurisprudence has broadly interpreted the scope of an officer's administrative duties and excepted from the definition of interrogation questions by police that are "ministerial in nature" or "normally attendant to arrest and custody." Mallozzi, 246 N.J. Super. at 515-16; State v. Stever, 107 N.J. 543, 561 (1987).

In Cunningham, police detectives questioned the defendant at headquarters, and he invoked his right to remain silent. 153 N.J. Super. at 350. The detectives then asked defendant for the names of any people living at his address, to which he obliged, lead the police to gather evidence. Id. at 351. The trial court suppressed the evidence, but we reversed, ruling that the officer's subjective intent was not controlling. Id. at 353-54. We held that "the information sought by the detective as to [Cunningham]'s address and the name of the person with whom he was living was ministerial in nature and outside the constitutional protection afforded against self-incrimination." Id. at 354.

The case under review here is analogous to Cunningham. After defendant invoked his right to an attorney, Detective Raynor asked him for his phone number, and defendant provided his cellphone number. In State v. Andrews, 243 N.J. 447, 485 (2020), our Court recently held that a court order requiring a criminal defendant to disclose the passcodes to his passcode-protected cellphone did not violate the self-incrimination clause of the Fifth Amendment to the United States Constitution or New Jersey's common law or statutory protections against self-incrimination. Therefore, the trial court appropriately allowed the historical cell site data information and analysis based on defendant's admissible statement regarding same, and we discern no error.

We are not persuaded by defendant's argument that the judge erred in allowing Hauger to testify. Hauger explained the limitations of historical cell data analysis and defense counsel had an opportunity to cross-examine him. Moreover, defendant did not present a rebuttal witness on historical cell site data information.

Expert testimony is admissible when "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue" and the proposed expert has the requisite "knowledge, skill, experience, training, or education" to form an expert opinion. Rule 702. There are three requirements for admission of expert testimony:

> (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.
>
> [State v. Kelly, 97 N.J. 178, 208 (1984).]

It is well-established that New Jersey courts apply the general acceptance within a scientific community test set forth in Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), to determine the admissibility of expert testimony in criminal cases. While our Supreme Court "adopted the factors identified in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 593-95 (1993), and a methodology-

based approach for determining scientific reliability in certain areas of civil law, [the Court has] not altered [its] adherence to the general acceptance test for reliability in criminal matters." State v. Cassidy, 235 N.J. 482, 492 (2018).

> "Proof of general acceptance within a scientific community can be elusive," and "[s]atisfying the test involves more than simply counting how many scientists accept the reliability of the proffered [technique]." State v. Harvey, 151 N.J. 117, 171 (1997). General acceptance "entails the strict application of the scientific method, which requires an extraordinarily high level of proof based on prolonged, controlled, consistent, and validated experience." Ibid. (quoting Rubanick v. Witco Chem. Corp., 125 N.J. 421, 436 (1991)). The proponent of the technique has the burden to "clearly establish" general acceptance, State v. Johnson, 42 N.J. 146, 171 (1964), and may do so using "(1) expert testimony, (2) scientific and legal writings, and (3) judicial opinions," State v. Cavallo, 88 N.J. 508, 521 (1982)[.]
>
> [Ibid. (alterations in original).]

"Whether expert testimony is sufficiently reliable to be admissible under [Rule] 702 is a legal question we review de novo." State v. J.L.G., 234 N.J. 265, 301 (2018). "When reviewing a decision on the admission of scientific evidence, an appellate court should scrutinize the record and independently review the relevant authorities, including judicial opinions and scientific literature." Harvey, 151 N.J. at 167.

28

The trial court correctly allowed Hauger's testimony. His analysis was based on scientific methods generally accepted as reliable, particularly within the confines of this case. The coverage maps were illustrative of Hauger's opinion countering defendant's theory that he was not in the coverage area where Dewyer was murdered. The actual testimony at trial establishes that there was no plain error. We note that defendant never challenged the scientific reliability of the historical cell site data analysis or the coverage maps Hauger testified to. The jury heard Hauger offer an opinion and was free to give it whatever weight they deemed appropriate.

IV.

Lastly, defendant argues he was unfairly portrayed as a criminal with a guilty conscience because he invoked his right to counsel; exercised his right to pre-trial bail on unrelated charges; and possessed an unlicensed firearm in his home. Defendant also contends the prosecutor elicited improper testimony from Detective Raynor about being asked to track down witnesses to confirm his presence in Roebling, and the unsolicited comment by Rivera that he and Dewyer discussed bail money deprived him of a fair trial.

Defendant did not raise any of these objections at trial. Accordingly, under the plain error standard, we will disregard the alleged errors unless they

are "clearly capable of producing an unjust result." R. 2:10-2. "Under that standard, defendant has the burden of proving that the error[s] [were] clear and obvious and that [they] affected [his] substantial rights." State v. Muhammad, 359 N.J. Super. 361, 372 (App. Div. 1998) (quoting State v. Morton, 155 N.J. 383, 421 (1998)). The errors claimed must be so egregious that they "raise a reasonable doubt as to whether it led the jury to a result it would otherwise not have reached." State v. Weston, 222 N.J. 277, 294 (2015) (quoting Pressler & Verniero, Current N.J. Court Rules, cmt. 2.1 on R. 2:10-2).

At trial, the prosecutor played the first part of defendant's statement for the jury, which included a discussion between defendant and Detective Raynor. The detective told defendant that he knew defendant had been with Dewyer all day on January 3, 2016. After being asked to elaborate on his story, Detective Raynor offered again to "run down" defendant's alibi. However, defendant declined to do so and asked for his attorney. The limited exchange shown to the jury could not have produced an unjust result.

Rivera's reference to "bail money" was remediated by the prosecutor by pointing out that the argument she witnessed was solely about "money." In his summation, the prosecutor only referenced Dewyer withdrew $1050 out of his bank account for defendant, and no mention was made it was for bail money.

We also reject defendant's argument that the trial court improperly allowed Cristinzio to testify that defendant mentioned possessing a gun in his motel room that was not his and failed to give a curative instruction, also raised for the first time on appeal. At some point, "[defendant] asked [Dewyer] to go get the gun from someone else's room, [r]oom [eleven], and [Dewyer] said he didn't want to touch the gun." At times, defendant slept in room eleven but claimed it was "someone else's room," and not his residence at the Riverfront Motel. Therefore, no instruction on the propriety of keeping an unlicensed firearm in one's home was warranted, and there was no plain error.

We have considered defendant's other arguments in his pro se supplemental brief and conclude they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

In sum, we conclude that the appropriate course of action is to remand for a Rule 104(a) hearing to determine the reliability of Sandra and Jeffrey Carver's statements and testimony as a condition for admissibility at the re-trial. We caution the parties that by mandating a Rule 104(a) hearing, we make no opinion or finding as to the admissibility of Sandra and Jeffrey Carver's proffered statements and testimony. Given our ruling for the trial court to conduct a Rule 104(a) hearing, we need not address defendant's argument on resentencing.

31

Instead, defendant's conviction and sentence are vacated, and the matter is remanded for further proceedings.

Reversed and vacated. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

**ROSE, J.A.D., concurring in part and dissenting in part.**

I join in the majority opinion insofar as it expresses our decision to reject the arguments defendant raises on appeal. But I cannot agree with my colleagues that cumulative errors – some of which were not raised before the trial court or this court – warrant reversal of the jury's verdict and a preliminary hearing at a retrial. Accordingly, I respectfully dissent.

I.

I begin by addressing the majority's conclusion that cumulative errors denied defendant a fair trial, noting the nature and extent of those "errors" are not fully analyzed. Instead, the majority seemingly suggests four of the prosecutor's closing remarks exceeded the bounds of fair comment. I discern the majority concludes those comments – taken together and combined with the Carvers' "impermissibly suggestive and prejudicial" testimony – denied defendant his right to a fair trial. Although the prosecutor's comments are set forth in the majority's factual recitation, they are not analyzed in view of the context of the trial as a whole and the governing law. I therefore pause to recite well-established principles that govern the relevant analysis before turning to the evidence that supports the prosecutor's remarks.

In reviewing a claim of prosecutorial misconduct, an appellate court considers whether: defense counsel raised "timely and proper objections"; "the

offending remarks were withdrawn promptly"; "the trial court struck the remarks and provided appropriate instructions to the jury"; and "the offending remarks were prompted by comments in the summation of defense counsel." State v. Smith, 212 N.J. 365, 403-04 (2012) (internal citations and quotation marks omitted). "Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial." State v. R.B., 183 N.J. 308, 333 (2005) (citation omitted). "Failure to make a timely objection indicates that defense counsel did not believe the remarks were prejudicial at the time they were made," and "deprives the court of the opportunity to take curative action." State v. Timmendequas, 161 N.J. 515, 576 (1999).

Moreover, New Jersey courts have long recognized prosecutors "are afforded considerable leeway in making opening statements and summations." State v. Williams, 113 N.J. 393, 447 (1988). They may even do so "graphically and forcefully." State v. Pratt, 226 N.J. Super. 307, 323 (App. Div. 1988).

Of course, "the primary duty of a prosecutor is not to obtain convictions but to see that justice is done." Smith, 212 N.J. at 402-03. A prosecutor's "duty is to prove the State's case based on the evidence and not to play on the passions of the jury or trigger emotional flashpoints, deflecting attention from the hard facts on which the State's case must rise or fall." State v. Blakney, 189 N.J. 88,

2

96 (2006). "A prosecutor must 'conscientiously and ethically undertak[e] the difficult task of maintaining the precarious balance between promoting justice and achieving a conviction,' ensuring that at all times his or her 'remarks and actions [are] consistent with his or her duty to ensure that justice is achieved.'" State v. Jackson, 211 N.J. 394, 408 (2012) (alterations in original) (quoting Williams, 113 N.J. at 447-48).

Even if the prosecutor exceeds the bounds of proper conduct, however, that finding does not end an appellate court's inquiry. "[I]n order to justify reversal, the misconduct must have been 'so egregious that it deprived the defendant of a fair trial.'" State v. Smith, 167 N.J. 158, 181 (2001) (quoting State v. Frost, 158 N.J. 76, 83 (1999)). "To justify reversal, the prosecutor's conduct must have been clearly and unmistakably improper, and must have substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense." Timmendequas, 161 N.J. at 575 (citation omitted); see also State v. McNeil-Thomas, 238 N.J. 256, 276 (2019).

Against that legal backdrop, I turn to the comments at issue, recognizing defendant did not object to any of the prosecutor's remarks cited by the majority before the trial court. Two of those comments neither were raised before us in defense counsel's merits brief nor defendant's supplemental pro se submission.

A-2755-17T1

Initially, I consider defendant's arguments to give context to the prosecutor's closing remarks. Defendant's strategy focused on his friendship with Dewyer, arguing he had no motive to kill his friend. Indeed, defense counsel characterized their relationship as "best friends." In response, the prosecutor cited the video evidence in the record, defendant's statements, and withdrawals from Dewyer's bank account prior to his murder to argue defendant "used" Dewyer "for his car" and "money." Notably, defendant told police, he often drove Dewyer's car because the victim "had bad legs."

After making the comments the majority construes as "malign[ing] defendant's character," the prosecutor continued:

> I think [defendant] is in the[ ] [casino] for about an hour gambling. Jim Dewyer comes in and finally sits down at the slot machines next to him. He's not playing the slot machines. You can watch the entire video, if you want, of the casino. I played different portions of it but I submit to you, there's not one minute where he's putting any quarters or any money in that slot machine. He's not gambling. He's sitting there. He's looking at the paper. At one point it looks like [Dewyer]'s falling asleep on that chair. [Dewyer]'s waiting for his good friend . . . who is gambling at the craps table.
>
> When [defendant] is done, he comes, taps [Dewyer] on the shoulder, "let's go." And then [defendant] walks so far ahead of him. This man is having trouble walking, give him your arm, go get a wheelchair for him. Do something. Walk with your

4

good friend. [Defendant] doesn't do that. He walks way ahead of him. He'll come back every once in a while and then he's gone again. Is that a good friend? I submit to you it's not.

The prosecutor's comments followed defense counsel's skillful attempt to argue defendant had no motive to kill his friend. Taken in context, the remarks that offend the majority were fair and based on the video footage that was admitted in evidence without objection. Further, defendant raised no objection to the prosecutor's comment before the trial court – or us. Accordingly, I discern no error, let alone plain error, in those remarks.

The majority next cites the prosecutor's argument that defendant changed his clothes to avoid detection. In doing so, the majority concludes the record does not support that conclusion. According to video footage from the Riverfront Hotel, however, when defendant arrived at 3:20 p.m. he was still wearing a dark colored hoodie, dark pants, and white sneakers. But nine minutes later, defendant appears to be wearing "plaid pajama pants" as described by High-Tech Crimes Unit Detective David Kohler, when the video is played for the jury during his testimony. Again, defendant did not challenge the prosecutor's remark before the trial court or on appeal. I discern no error, let alone plain error, in that comment, which is supported by the trial evidence.

5

The majority also references the prosecutor's remark that the lead detective "practically begged" defendant for his alibi witness during his custodial questioning. In doing so, the majority notes defendant did not "hav[e] the benefit of counsel." Implicit in the majority's comment is its conclusion that the prosecutor's comment was improper. Yet, the majority found no error in the court's denial of defendant's motion to suppress his statements. Because I agree that defendant's statements were properly admitted at trial, I discern no error in the prosecutor's comment.

The final closing remark cited by the majority follows its observation that neither Sandra nor Jeffrey Carver identified defendant in or out of court. The prosecutor commented: "The person that the Carvers saw that day was the defendant." Again, the majority does not analyze whether or how that remark was improper, and if so, whether it rose to plain error. Again, the comment is taken out of context.

A summary of the evidence bears repeating. During the multi-day jury trial, the State presented the testimony of seventeen witnesses and introduced in evidence numerous exhibits, including surveillance video; defendant's statements to police; and expert testimony concerning defendant's cellphone location data. No weapon was recovered, but forensic evidence revealed

Dewyer was shot in his left rib cage, at close range, while seated in the front passenger's seat of his car. No one witnessed the shooting, but surveillance video footage captured defendant and Dewyer together during most of the day. Much of the video footage depicted defendant driving Dewyer's silver car, with Dewyer in the front passenger's seat. Dewyer was last seen alive in that manner about three hours before police discovered his lifeless body – in the front passenger's seat of his car.

Although neither Jeffrey nor Sandra Carver made an in-court or out-of-court identification, they observed a man fitting defendant's general description walking from the remote area where they observed a silver car parked askew. He was carrying a backpack with an orange, yellow or red color on top. Defendant did not testify, but his statements concerning his whereabouts at the time of the murder contradicted his cellphone activity. Notably, the majority upheld the admission of defendant's custodial statements to police and the experts' opinion concerning cellphone location.

Typical of a circumstantial evidence case where, as here, identification is at issue, the prosecutor told the jury: "You have to look at the evidence in its totality. Much like this case – pieces of a puzzle – when you fit [them] together you can identify the defendant as the murderer." See State v. Michaels, 264 N.J.

Super. 579, 641 (App. Div. 1993) (finding the prosecutor could use a "puzzle analogy" to argue that the defendant was guilty).

The prosecutor's summation spans thirty-six transcript pages; the remark at issue was made toward the end of the prosecutor's summation, after he argued: defendant was not Dewyer's friend; video from the casino and hotel placed Dewyer with defendant most of the day, with defendant driving Dewyer's silver car; defendant's statement claiming Dewyer dropped him off in Roebling, where defendant met with someone he refused to identify; and defendant's cellphone "never hits off of [the] Roebling [sector] between 1:34 and 3:30," but rather it hits off two sectors that overlap "and the crime scene is right on the border of that overlap." Among other things, the prosecutor recounted Cristinzio's testimony describing defendant's reaction when told Dewyer was dead: "And the interesting part about that is . . . the reaction that she told you [defendant] had. Not, 'oh, my God, my good friend Jimmy Dean is dead.' That's not the reaction he had." Defendant instead told Cristinzio, "Well, I was on a date." The prosecutor also recounted Rivera's testimony "that in the weeks leading up to [the] murder," Rivera overhead Dewyer and defendant arguing about money defendant owed the victim.

When discussing the Carvers' testimony, the prosecutor argued, in pertinent part:

> Now, on January 3 the Carvers are driving down Kinkora Road at about three o'clock, I believe the testimony was. And when they're driving down Kinkora Road they see the victim's vehicle parked in that cut-out, okay. The car's up into the woods a little bit. They see it. It's still daylight when they observe it. They drive past. And after they drive past they observe someone walking down the road, a person who appeared to be out of place to them. He's walking down the left-hand side of the road. And both of the Carvers described him as a large man. He was over six feet tall and over 200 pounds. They can't identify him. Much like if you're driving down the road in your neighborhood, you see somebody that you don't recognize, they just don't fit into that neighborhood for some reason, they're not a resident. These people grew up there. They've lived there for twenty-some-odd years. They knew the people walking back and forth. They thought it was the person that broke down possibly back in that car. But they knew he wasn't a regular in the neighborhood. They see him walking.

> And just like you, if you see somebody in your neighborhood and then you're asked four days and ten days later to describe what you saw, you're probably not going to know . . . he had a brown suit on, he had this on, he had that on. What you're going to remember are the things that stood out to you and the things that make that person stand out and be out of place.

> So, they remembered he was a large man, over 200 pounds, over six feet tall. They remembered he was not black but light skinned, maybe mixed race, or, you know, brown skin. They remember that as they

A-2755-17T1

approached, he kept looking back and glancing over his shoulder at them. And they remember a backpack. And their description of the backpack was off. Sandra says it was, you know, yellow and orange possibly. But [Jeffrey] says, I believe it was black and I think it had some red or some silver in it. They can't identify it. They didn't witness the murder, by the way, so the fact that there's no identification in court, they tell you right up front, they can't identify him. They can't I.D. him. And in retrospect, that doesn't matter anyway because they didn't witness the murder, they just witnessed the person walking down the street. So, they remember the details, as I stated, that stand out to them.

And then you look at the fingerprint card that . . . [is] in evidence. Look at the height and weight . . . . Six-foot [sic] three, 265 pounds. Certainly, a large man. He's brown skinned. He's over six-foot [sic] and he's over 200 pounds. That general description that the Carvers gave that day matches the defendant. They also remember that as he kept looking back at them and glancing back over his shoulder as he walked, he's carrying a backpack.

Then when you look at the video of the motel – and [you] see him at about three, a little after three, a little before three [o'clock]. 3:28 p.m. at the motel, what do you see? You see a large brown-skinned male, carrying a backpack, coming from the direction of Kinkora Road. It's not a coincidence. <u>The person that the Carvers saw that day was the defendant.</u> They couldn't identify him and say yes, that's him, I see his face, it's definitely him but the general description matches. It's too much of a coincidence to not be him.

[(Emphasis added).]

10

Earlier, when discussing the video footage depicting defendant leaving the Riverfront Hotel at approximately 1:30 p.m., the prosecutor said: "you see [defendant] grab a backpack. He grabs that backpack, it looks like it's black with red and silver on it, kind of like [Jeffrey] stated, and he puts that in the car."

Surely, the Carvers' observations of a man fitting defendant's general description, who was seen walking from the direction of Dewyer's car, with a backpack that resembles the backpack captured on the Riverfront Hotel's video footage at 1:30, when defendant left the Riverfront Hotel with Dewyers, provided a sufficient basis for the prosecutor's comment. I therefore conclude the remark was a reasonable inference suggested by all the evidence adduced at trial.

In sum, all four closing remarks that the majority apparently finds objectionable must be contextualized amid the circumstantial evidence that underscored defendant's guilt in response to counsel's arguments. And, given the lack of an objection, no unjust result occurred from those remarks – in part or in combination.

## II.

Although the majority reverses defendant's conviction based on cumulative errors – including the prosecutor's remarks that I find acceptable for

11

the reasons stated – it appears its main bone of contention is the court's admission of the Carvers' testimony, without issuing a proper jury instruction. As my colleagues accurately observe, defendant neither challenged the admissibility of the Carvers' testimony nor sought an identification instruction from the trial court.[1] Before us, defendant still does not claim the Carvers' testimony was admitted erroneously.

A.

In reaching its decision that an N.J.R.E. 104 hearing is necessary on retrial, the majority nonetheless generally acknowledges a pretrial Wade hearing was unnecessary because there was no "show-up identification" in this case.[2] I agree with that conclusion.

Citing its "concern[s] that the Carvers' testimony was impermissibly suggestive and prejudicial to defendant, and the jury may have erroneously drawn a conclusion that he was the perpetrator," the majority nonetheless would have the trial court conduct a preliminary hearing to determine the admissibility

---

[1] Defendant moved for a mistrial, acquittal, and new trial on other grounds.

[2] More accurately, defendant was not entitled to a Wade-Henderson hearing inasmuch as there was no pretrial identification whatsoever of defendant by the Carvers. Henderson, 208 N.J. at 218-19 (holding a pretrial hearing is required when police conduct any out-of-court identification procedure).

of the Carvers' testimony at a retrial. In that regard, the majority concludes the trial court must determine whether the Carvers' testimony would "cause undue prejudice in the minds of the jurors and should be barred." In doing so, the majority conflates the rules regarding admission of relevant evidence – when that evidence was not challenged here – with our Supreme Court's jury instructions regarding pretrial identification procedures.

In my view, the majority's outcome departs from well-established evidentiary principles. It is beyond peradventure that our review of evidentiary decisions is discretionary. See State v. Cole, 229 N.J. 430, 449 (2017). We must uphold such decisions when they are supported by sufficient credible evidence in the record. See McNeil-Thomas, 238 N.J. at 272; State v. S.S., 229 N.J. 360, 374 (2017). Of course, if the trial court applies the wrong legal test when analyzing admissibility issues, we apply de novo review. State v. Hyman, 451 N.J. Super. 429, 441 (App. Div. 2017); see also State v. Nantambu, 221 N.J. 390, 402-03 (2015) (recognizing "we accord no deference to the trial court's legal conclusions."). Here, apparently citing Henderson,[3] the majority

---

[3] In Henderson, the Court set forth a four-step framework for the admissibility of pretrial identification procedures. 208 N.J. at 288-89. The fourth step provides in relevant part: "[I]f after weighing the evidence presented a court finds from the totality of the circumstances that defendant has demonstrated a

seemingly concludes the trial court should have determined from "the totality of the circumstances" whether the Carvers' testimony should be suppressed or admitted at trial.

However, even if Jeffrey or Sandra Carver had made a pretrial identification of defendant, Henderson does not require a preliminary hearing for the court to determine whether their proposed testimony is impermissibly suggestive; it requires the court to determine whether an identification procedure was impermissibly suggestive. 208 N.J. at 218-19. Because there was no identification procedure here, there was no basis for the trial court to conduct a Wade-Henderson or other preliminary hearing to determine the admissibility of the Carvers' testimony in the present trial.

Pursuant to N.J.R.E. 403, evidence is presumed admitted unless the trial court finds its probative value is substantially outweighed by its prejudicial value, with the burden placed on the party seeking to exclude that evidence. Santamaria, 236 N.J. at 406; Cole, 229 N.J. at 452-53. My review of the record reveals the testimony of the Carvers was relevant and probative on the issue of identity: Sandra and Jeffrey testified about the general description of defendant

---

very substantial likelihood of irreparable misidentification, the court should suppress the identification evidence. If the evidence is admitted, the court should provide appropriate, tailored jury instructions . . . ." Id. at 289.

– his weight; height; skin tone – and that they saw him walking from an oddly-parked silver car, carrying a backpack with red, orange or yellow on top, shortly before Dewyer's lifeless body was discovered in his silver car. That testimony tended to prove a fact in dispute, as corroborated by cell site data, and disprove defendant's uncorroborated claim he was in Roebling around the time of the murder. I therefore respectfully disagree with the majority that an N.J.R.E. 104 hearing is necessary to determine the admissibility of the Carvers' testimony.

B.

Turning to defendant's belated claims of error in the jury charge, the majority cites, without analyzing, the model jury charge, "Identification: No In-Or-Out-Of-Court Identification" (lack-of-identification charge). Notably, defendant now argues the trial court failed to issue the lack-of-identification charge and failed to instruct the jury about estimator variables pursuant to Henderson, 208 N.J. at 261. Because the majority does not analyze the lack-of-identification charge, I do so to better address defendant's argument.

Without citation to caselaw, the footnote to the lack-of-identification charge suggests the "instruction should be given when defendant's defense is that he[] did not commit the crime and the State is seeking to prove his[] guilt without adducing any direct identification evidence, e.g., is relying on

circumstantial evidence to tie the defendant to the crime." This instruction advises jurors in circumstantial evidence cases, such as this one, that the identity of a criminal offender is a necessary element that the prosecution must prove beyond a reasonable doubt. The absence of positive identifications by the Carvers does not eliminate the utility of this instruction; instead that absence underscores the instruction's utility. I am therefore persuaded that the trial court – although it was not requested by defendant to do so – should have issued the lack-of-identification charge.

That said, I disagree with the majority's implicit suggestion that the omission of that instruction constitutes plain error that compels reversal. R. 2:10-2. As my colleagues observe, the jury was more generally advised of the State's burden to prove all elements of the charged offenses beyond a reasonable doubt. And the trial court did more than explain the difference between circumstantial and direct evidence. The court also instructed the jury: "A conviction may be based on circumstantial evidence alone, or by a combination of circumstantial evidence and direct evidence, provided, of course, here you are convinced of the defendant's guilt beyond a reasonable doubt." To be sure, while it would have been preferable for the court to have issued the lack-of-

identification charge, I am unable to conclude under our plain error standard that the failure to do so here constitutes reversible error.

* * * *

In sum, I discern no error – separate or cumulative – that requires reversal of defendant's convictions.  Accordingly, I concur with the majority's decision to the extent it rejects defendant's arguments raised on appeal.[4]  I respectfully dissent for all other reasons stated.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[4]  Notwithstanding my concurrence, I disagree with the majority's apparent criticism that "defendant did not present a rebuttal witness on historical cell site data information."  On appeal, defendant asserts the trial judge failed to rule on his request for a Frye hearing.  Although that contention is unsupported in the record, it is axiomatic that the burden of proving reliability of scientific evidence is on the party seeking to establish its reliability.  See Harvey, 151 N.J. at 171; see also Cassidy, 235 N.J. at 492.  As the burden the proof always rested with the State, see Model Jury Charges (Criminal),"Criminal Final Charge" (rev. May 12, 2014), defendant was under no obligation to present any evidence to rebut the reliability of Hauger's testimony.

A-2755-17T1