269 N.J. Super. 581 (1994)
636 A.2d 105
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
EDWARD BOHUK, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted December 13, 1993.
Decided January 21, 1994.
*585 Before Judges PETRELLA, BAIME and VILLANUEVA.
Zulima V. Farber, Public Defender, attorney for appellant (Mark E. Tabakman, designated counsel, on the brief).
Robert W. Gluck, Middlesex County Prosecutor, attorney for respondent (Simon Louis Rosenbach, Assistant Prosecutor, of counsel and on the letter-brief).
The opinion of the court was delivered by BAIME, J.A.D.
Following a protracted jury trial, defendant was acquitted of attempted murder (N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3), but found guilty of first degree robbery (N.J.S.A. 2C:15-1), second degree aggravated assault (N.J.S.A. 2C:12-1b(1)), ten counts of theft (N.J.S.A. 2C:20-3; N.J.S.A. 2C:20-7; N.J.S.A. 2C:21-6c), and fourth degree uttering a forged instrument (N.J.S.A. 2C:21-1a(3)). The trial court merged all of the counts into the conviction for first degree robbery and sentenced defendant to an extended term of 60 years. As part of the sentence, defendant is to serve 22 1/2 years without parole eligibility. In addition, the trial court imposed a penalty of $10,000 payable to the Violent Crimes Compensation Board.
*586 Defendant appeals, contending that (1) the police failed to scrupulously honor his assertion of the Fifth Amendment privilege against self-incrimination and the resulting statement should have been excluded, (2) the trial court erroneously denied his motion to suppress evidence, (3) the identification procedures employed by the police were impermissibly suggestive, (4) the trial court erred by deciding that his convictions would be admissible if he testified, (5) he was irremediably prejudiced by the State's intentional destruction of evidence, (6) his motion for a judgment of acquittal should have been granted, and (7) the sentence imposed was manifestly excessive. In his pro se supplemental brief, defendant claims that he was denied his right to a speedy trial. We find no error warranting a reversal of defendant's conviction or the sentence imposed.

I.
On May 28, 1988, James Curran was brutally beaten and left for dead in his suburban home located in Colonia, New Jersey. The circumstances surrounding the vicious attack are not entirely clear. Curran's wife and daughter were away for the weekend when the incident occurred and his devastating injuries left him without any memory of the events leading up to the commission of the crime. Earlier in the day, Curran had lunch with his longtime friends and neighbors, Adelle and William Gillis. He was invited to return to the Gillis's house the following day for a barbecue.
On May 29, 1988, Mrs. Gillis awoke at approximately 7:00 a.m. and, as was her custom, went to the bedroom window to view the morning. Her attention was immediately drawn to a man who was exiting Curran's house from the back door. The man initially walked toward the driveway, but suddenly returned to the house. Shortly thereafter, Mrs. Gillis observed the man drive away in Curran's white Ford Taurus. Gillis initially thought the person who departed the residence was Curran's son, who was 23 at the time. Her suspicions were apparently aroused because she commented to her husband that she was not certain the individual was *587 Curran's son. She nevertheless dismissed the incident as inconsequential.
The Gillises later became concerned when Curran failed to appear for the scheduled barbecue. Mr. Gillis received no response at the door and thus entered Curran's house. After receiving no reply to his calls, Gillis wandered into Curran's den and discovered him lying naked on the floor covered with blood. The police were immediately called. Detective John Jorgensen responded shortly thereafter and found Curran "on the floor, unconscious[,] ... badly beaten about the face." At trial, Jorgensen testified that Curran's "wrists were swollen" and he "was naked [with] ... blood emitting from his mouth, ... nose, ... ears and ... head." According to Jorgensen, Curran's head "looked like a pumpkin."
Several items were taken by the police from the Curran residence, including a Dewars Scotch bottle, a Seagram's 7 bottle, and a paperback book entitled First Handbook for Loving Men. Three empty Budweiser beer cans were recovered from the kitchen and two were found on the dining room table. Another empty beer can was found in the den.
The bedroom and den had jewelry strewn about and blood spots on the walls. The house was in "shamble[s]." In the bedroom, an open jewelry box was found on the bed, dresser drawers were open and items were scattered on the floor. All of the silverware was missing. The residence was dusted for fingerprints and Curran's automobile was reported stolen in the national and state computer system, the NCIC.
On May 31, 1988, a white male entered Mayfair Supermarkets in Edison and had the store manager, Michael Fiorentino, cash a paycheck in the amount of $786.74 made payable to James F. Curran. The individual presented Curran's driver's license as identification. Fiorentino subsequently identified defendant as the person for whom he cashed the check.
*588 On June 5, 1988, State Trooper Robert Wilk was patrolling the Garden State Parkway when, at approximately 5:10 p.m., he observed a white Ford Taurus parked on the right hand shoulder near mile post 16. Defendant was seated in the driver's seat, apparently sleeping. Wilk observed an empty brandy bottle between defendant's legs and a beer bottle on the passenger side. After rousing defendant, Wilk asked for his driver's license. In response, defendant produced a license and registration bearing the name James Curran. After smelling alcohol on the defendant's breath and administering a balance test, Wilk placed him under arrest for driving while intoxicated. Defendant was handcuffed and placed in the trooper's patrol car where he was advised of his constitutional rights. At that point, Wilk received an NCIC teletype, noting that the Ford Taurus should be held for latent fingerprints. The automobile was later towed to the State Police barracks in Bass River.
Defendant was taken to the Avalon substation where he was processed on a charge of driving while intoxicated and again apprised of his constitutional rights. After refusing to sign an acknowledgment that he had been advised of his rights, defendant was asked 14 questions from an "Alcohol Influence Report." Defendant responded to the first question concerning his occupation, noting that he was a hairdresser. He offered no response to any of the remaining questions. At some point during the processing, Wilk examined the driver's license and registration that defendant had given him. Believing that defendant looked no more than 30 years old, Wilk questioned him about the 1929 date of birth which appeared on the license. Defendant replied that he was Edward Bohuk.
Wilk then received a telephone call from his supervisor indicating that the automobile defendant had been driving belonged to James Curran and that the suspect was "wanted for aggravated assault and theft." Wilk then exclaimed that the Ford Taurus was a stolen automobile. As Wilk explained at the Evid. R. 8 hearing, this "was not a question" but merely "a statement immediately *589 made after [he] learned the vehicle was stolen." Wilk testified that he did not "anticipate a response" and that his statement was "spontaneous." In any event, defendant quickly replied that he "knew the [Ford Taurus] had probably been stolen" and he "had gotten [it] from a friend at a party the previous evening." Wilk then examined the wallet defendant had presented him and found numerous credit cards bearing Curran's name.
Shortly thereafter, defendant was transported to the Bass River barracks. On the ride, Wilk told defendant that he would be questioned about an incident that occurred in Woodbridge Township and that he was a "possible murder suspect." Upon their arrival, defendant was placed in a holding cell and given food. Defendant signed a "Miranda card," indicating that he had been read his rights earlier in the day.
Defendant was then taken into an office where he was introduced to Sergeant Rocco Mazza and Detective Dennis Watson of the Middlesex County Prosecutor's Office and Sergeant Carl Gurney of the Woodbridge Township Police Department. Watson again apprised defendant of his constitutional rights. Defendant acknowledged that he understood his rights and was then questioned. Defendant claimed that a friend had given him the Ford Taurus earlier in the day and that he knew the automobile had been stolen. He denied that he knew Curran or that he had ever been present in his house. Defendant claimed that he had spent the morning of May 29, 1988, drinking with friends at the Bottoms-Up Tavern in Elizabeth and that he later went to New York City with two girlfriends to buy drugs. Pertaining to May 30, 1988, defendant indicated that he accompanied Jo Ann Fletcher and her daughter to an amusement park in Keansburg. According to defendant, they drove Fletcher's automobile. Defendant claimed that he was on his way to his apartment in Wildwood when arrested.
Subsequent investigation by the police disclosed that much of defendant's statement was untrue. For example, Fletcher testified that she did not own an automobile and that the two had used *590 defendant's "white car" on their drive to Keansburg. During the trip, defendant showed her small items of jewelry and asked where he could sell them. Thomas Freel, the owner of the Bottoms-Up Tavern, corroborated defendant's claim that he had patronized the bar earlier in the week. Freel went on to note that defendant had asked him to "check out" his new "[w]hite car."
The police obtained a court order requiring defendant to appear in a line-up which was conducted on June 9, 1988. The line-up was viewed by Mrs. Gillis and Alma Cahill, another of Curran's neighbors. Although the record is not altogether clear, Cahill had apparently seen a suspect in the neighborhood at about the time Curran was attacked and robbed. Both Gillis and Cahill had assisted the police in preparing a composite sketch. All of the people appearing in the line-up had physical characteristics similar to those of defendant. Cahill viewed the line-up first. She chose an individual named Carl Tattoli. Gillis then went into the room and viewed the line-up. She identified the defendant as the individual she had seen leaving Curran's residence. Although Gillis later testified that she was "practically positive" and "ninety-nine and forty-four one hundredths percent sure" that defendant "was the man[,]" she was far more equivocal on the date of the line-up. Prior to identifying defendant on that day, she noted that she couldn't "be sure [or] positive," but she thought he was the individual she had seen. At trial, Gillis offered clarification, noting that the person she selected at the line-up looked older than the man she observed leaving Curran's house. Gillis was unable to identify defendant at trial.
As we noted earlier, Curran was unable to recall the events leading up to the robbery because of the devastating injuries he suffered. Curran was on a respirator for approximately two weeks and was in the intensive care unit for three weeks. Some of his injuries are permanent. He presently suffers from "slurred speech" and short term memory loss. At trial, Curran testified that he kept his credit cards in his bedroom dresser, not in his *591 wallet. He admitted to frequenting an adult book store during the spring of 1988.
The State presented substantial forensic evidence placing defendant at the scene of the crime. Robert Garrett, a member of the Middlesex County Prosecutor's identification bureau, testified that he was able to identify five of defendant's fingerprints on items recovered from Curran's house and the trunk of the Ford Taurus. Specifically, defendant's fingerprints were found on a Dewars Scotch bottle, a Seagram's 7 bottle, an oval dish, a sugar bowl and a twin bowl server. The bottles were found in Curran's house. The other items were recovered from the trunk of his automobile.
Cross-examination revealed that Garrett catalogued 20 additional prints, but they were all insufficient for identification purposes. Although Garrett destroyed his notes after preparing his report, the defense was provided with all 107 photographs that he used in determining whether any recovered items contained identifiable fingerprints.
It is against this factual backdrop that we examine defendant's arguments.

II.
We first consider defendant's argument that the police failed to scrupulously honor his assertion of the Fifth Amendment privilege and that the resulting statement should have been excluded. Although ambiguously phrased, defendant's argument is in two parts. Initially, he claims that his silence when questioned by Trooper Wilk for the purpose of completing the "Alcohol Influence Report" constituted an assertion of the privilege against self-incrimination. He then asserts that Wilk's statement that the Ford Taurus was stolen was reasonably calculated to elicit an incriminatory response. Defendant argues that this police-initiated questioning following his invocation of the right to remain silent was in violation of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
*592 The applicable principles are well-settled. The warnings set forth in Miranda are required when an individual is subjected to custodial interrogation. State v. Williams, 59 N.J. 493, 501, 284 A.2d 172 (1971). Custodial interrogation of a suspect must cease if he "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent." Miranda v. Arizona, 384 U.S. at 473-74, 86 S.Ct. at 1627-28, 16 L.Ed.2d at 723. The suspect is not required to phrase the assertion of his privilege with the "utmost of legal precision." State v. Johnson, 120 N.J. 263, 281, 576 A.2d 834 (1990). "[A]n equivocal indication of a desire to remain silent ... suffices to invoke Miranda's requirement that the interrogation cease." Christopher v. Florida, 824 F.2d 836, 841 (11th Cir.1987), cert. denied, 484 U.S. 1077, 108 S.Ct. 1057, 98 L.Ed.2d 1019 (1988). A suspect need not use "talismanic" words to assert his right to remain silent. Martin v. Wainwright, 770 F.2d 918, 924 n. 6 (11th Cir.1985), cert. denied, 479 U.S. 909, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986). "Silence itself has been interpreted as an invocation of [the Fifth Amendment privilege]." State v. Johnson, 120 N.J. at 281, 576 A.2d 834 (citing Watson v. State, 762 S.W.2d 591, 597-98 (Tex.Ct.Crim.App. 1988)).
Once the right to remain silent has been asserted, it must be "scrupulously honored." Michigan v. Mosley, 423 U.S. 96, 102-03, 96 S.Ct. 321, 325-26, 46 L.Ed.2d 313, 320-21 (1975); Miranda v. Arizona, 384 U.S. at 467, 86 S.Ct. at 1624, 16 L.Ed.2d at 719; State v. Johnson, 120 N.J. at 282, 576 A.2d 834; State v. Bey, 112 N.J. 45, 66, 548 A.2d 846 (1988); State v. Hartley, 103 N.J. 252, 260-61, 511 A.2d 80 (1986); State v. Kennedy, 97 N.J. 278, 288, 478 A.2d 723 (1984). In State v. Hartley, 103 N.J. 252, 511 A.2d 80, our Supreme Court said that the issuance of a new set of warnings is "indispensable" before questioning may be resumed after a suspect has invoked his right to remain silent. Id. at 267, 511 A.2d 80. If there is any doubt as to whether the suspect has asserted his Fifth Amendment privilege, questions may be propounded to clarify his intentions. State v. Johnson, 120 N.J. at 283, 576 A.2d 834 (citing Christopher v. Florida, 824 *593 F.2d at 841-42). "Only if the suspect [then] makes clear that he is not invoking his Miranda rights should substantive questioning be resumed." State v. Wright, 97 N.J. 113, 120 n. 4, 477 A.2d 1265 (1984).
Applying these principles we regard defendant's refusal to respond to the questions propounded by Trooper Wilk to complete the "Alcohol Influence Report" as an invocation of the Fifth Amendment privilege against self-incrimination. In reaching this conclusion, we recognize that "booking procedures and the routine questions associated [with that process] are ministerial in nature and beyond the right to remain silent." State v. Mallozzi, 246 N.J. Super. 509, 515, 588 A.2d 389 (App.Div.), certif. denied, 126 N.J. 331, 598 A.2d 889 (1991); State v. Cunningham, 153 N.J. Super. 350, 352, 379 A.2d 860 (App.Div. 1977); see also United States ex rel. Hines v. La Vallee, 521 F.2d 1109, 1112-13 (2d Cir.1975), cert. denied sub nom. Hines v. Bombard, 423 U.S. 1090, 96 S.Ct. 884, 47 L.Ed.2d 101 (1976). In contrast, "station-house" questioning of an individual suspected of drunk driving must be preceded by Miranda warnings. Berkemer v. McCarty, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); see also State v. Taylor, 199 N.J. Super. 339, 345, 489 A.2d 720 (Law Div. 1984). Although there may be some confusion between a suspect's duty to undergo a breathalyzer test and his right to remain silent, see State v. Leavitt, 107 N.J. 534, 538, 527 A.2d 403 (1987), we are convinced that a refusal to respond to even preliminary questions concerning a drunk driving charge should be regarded as an assertion of the Fifth Amendment privilege. So posited, Trooper Wilk and the other law enforcement officials were obliged to "scrupulously honor" defendant's election to remain silent. Any statement made thereafter in response to police initiated custodial interrogation without, at minimum, the rendition of fresh Miranda warnings, would be violative of defendant's constitutional rights.
The remaining issue is whether Trooper Wilk improperly resumed questioning after the defendant invoked his Fifth Amendment privilege. In resolving this question, we stress that *594 "the special procedural safeguards outlined in Miranda are required not where a suspect is simply taken into custody, but rather where [he] [is] in custody [and] is subjected to interrogation." Rhode Island v. Innis, 446 U.S. 291, 300, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297, 307 (1980). Voluntary statements  those not elicited through interrogation  made by a suspect while in custody are admissible at trial. State v. Stever, 107 N.J. 543, 552, 527 A.2d 408, cert. denied, 484 U.S. 954, 108 S.Ct. 348, 98 L.Ed.2d 373 (1987). As conceptualized in Miranda, interrogation "must reflect a measure of compulsion above and beyond that inherent in custody itself." Rhode Island v. Innis, 446 U.S. at 300, 100 S.Ct. at 1689, 64 L.Ed.2d at 307.
Miranda's protection extends only to acts of police officers "reasonably calculated to elicit an incriminating response." State v. Lozada, 257 N.J. Super. 260, 268, 608 A.2d 407 (App.Div.), certif. denied, 130 N.J. 595, 617 A.2d 1218 (1992). To fall afoul of that rule, the defendant's statement must have been the product of police questioning or its functional equivalent. State v. Mallozzi, 246 N.J. Super. at 516, 588 A.2d 389. Stated somewhat differently, the term "interrogation" under Miranda refers to express questioning and any words or actions by the police that they "should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. at 301, 100 S.Ct. at 1689-90, 64 L.Ed.2d at 308.
Following a lengthy pretrial hearing on this subject, Judge Messina rendered detailed findings of fact in which he concluded that Trooper Wilk's statement, "[the Ford Taurus] was a stolen vehicle," was not a question or the functional equivalent of a question. Our thorough examination of the record convinces us that the judge's finding was entirely correct and supported by substantial, credible evidence present in the record. Wilk testified that he uttered the statement "immediately after [he] learned the vehicle was stolen" and that he "did not anticipate a response." As we understand it, the trooper merely repeated what he had been told. Wilk recounted that "[t]here was no purpose behind" *595 the statement and that it was "spontaneous." We emphasize that it was the defendant who initiated the conversation. There is nothing in the record to indicate that defendant was especially susceptible to suggestion or that the trooper attempted to engage him in further conversation relating to the subject. We are satisfied, as was Judge Messina, that defendant's rights were "scrupulously honored."
We add one point before leaving the subject. Even if we were to regard the admission of defendant's statement into evidence as constitutional error, we would nevertheless affirm his conviction. Assuming error was committed, it was harmless beyond a reasonable doubt. Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Defendant never contested the fact that Curran's automobile had been stolen. Moreover, his subsequent statements made to Detectives Watson and Gurney went much further and were of an independent origin. Given the gap in time, the rendition of fresh Miranda warnings, and the different officers conducting the second inquiry, the latter statements were not the product of the initial illegality and were not tainted by it. State v. Hartley, 103 N.J. at 283, 511 A.2d 80.

III.
We reject defendant's contention that the search of Curran's automobile violated his Fourth Amendment rights. Initially, we observe that a defendant operating an automobile known by him to have been stolen has no reasonable expectation of privacy in its contents. State v. Lugo, 249 N.J. Super. 565, 568, 592 A.2d 1234 (App.Div. 1991); see also State v. Lee, 245 N.J. Super. 441, 450, 586 A.2d 256 (App.Div. 1991). Beyond this, the police clearly had probable cause to search the vehicle in light of defendant's behavior at the time of his arrest and the information received by way of the NCIC teletype. Moreover, it is well-recognized that automobiles may be searched without a warrant provided that there is probable cause to believe that the vehicle contains evidence of criminal activity. State v. Demeter, 124 N.J. *596 374, 380, 590 A.2d 1179 (1991) (citing Carroll v. United States, 267 U.S. 132, 156, 45 S.Ct. 280, 286, 69 L.Ed. 543, 552 (1925)). The fact that the automobile was towed to the State Police barracks before it was searched does not render the automobile exception inapplicable. Chambers v. Maroney, 399 U.S. 42, 52, 90 S.Ct. 1975, 1982, 26 L.Ed.2d 419, 428-29 (1970); see also State v. Alston, 88 N.J. 211, 233, 440 A.2d 1311 (1981). The Law Division judge properly denied defendant's motion to suppress evidence.

IV.
Equally unpersuasive is defendant's argument that the trial court erroneously refused to exclude the State's identification evidence. Defendant argues that the individuals displayed in the line-up did not comport with Gillis's description of the person she observed leaving Curran's residence. It is also argued that evidence relating to Gillis's pretrial identification of defendant should have been suppressed because of the uncertainty the witness expressed in viewing the line-up.
Having participants in a line-up of similar age and physical characteristics militates against finding the identification impermissibly suggestive. Otherwise, the procedure would unfairly focus attention on the defendant. State v. Clausell, 121 N.J. 298, 326, 580 A.2d 221 (1990); State v. Andrial, 203 N.J. Super. 1, 8, 495 A.2d 878 (App.Div. 1985). We note that defendant was assigned an attorney to represent him at the line-up. See United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). She testified at the pretrial hearing that the line-up was "fair" and that there was nothing suggestive in the procedures employed. Following a lengthy hearing, the trial court agreed with this assessment. We are in complete accord with the trial court's conclusion.
Gillis's hesitation in selecting the defendant from the line-up was one of the totality of circumstances considered by the trial court in determining whether the identification was the product of suggestive procedures or was otherwise unreliable. See Manson *597 v. Brathwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140, 154 (1977); Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, 411 (1972); State v. Madison, 109 N.J. 223, 232-33, 536 A.2d 254 (1988). Whatever weaknesses existed in the State's identification evidence were properly a matter for the jury to assess. See State v. Carter, 91 N.J. 86, 131, 449 A.2d 1280 (1982); State v. Grant, 254 N.J. Super. 571, 590 n. 4, 604 A.2d 147 (App.Div. 1992).

V.
Bohuk's remaining arguments clearly lack merit and do not require extended discussion. R. 2:11-3(e)(2). We offer the following brief comments.
We are unpersuaded by defendant's claim that he was denied due process by the State's intentional destruction of notes relating to fingerprint evidence. Destruction of Investigator Garrett's notes clearly had no impact upon the opportunity of the defense to attack the State's fingerprint evidence. There is no evidence that these notes had any exculpatory value or were otherwise material. Nor is there any suggestion in the record that they were destroyed in bad faith. In any event, the defense was supplied with all 107 photographs of potential fingerprints along with Investigator Garrett's written report. Clearly, defendant was not prejudiced by destruction of the notes. See California v. Trombetta, 467 U.S. 479, 488-89, 104 S.Ct. 2528, 2533-34, 81 L.Ed.2d 413, 422 (1984); State v. Serret, 198 N.J. Super. 21, 26, 486 A.2d 345 (App.Div. 1984), certif. denied, 101 N.J. 217, 501 A.2d 899 (1985).
Also devoid of merit is defendant's argument that the trial court erred by denying his motion for a judgment of acquittal. See State v. Reyes, 50 N.J. 454, 458-59, 236 A.2d 385 (1967). The State's evidence against defendant can fairly be characterized as overwhelming.
*598 The trial court did not abuse its discretion in ruling that defendant's convictions were admissible. Defendant's extensive record of criminality evidenced a pattern of illegality. Many of the convictions bore directly on defendant's veracity. Had the defendant testified, the jury would have had the right to weigh whether one who repeatedly violated society rules might ignore the duty to testify truthfully. State v. Sands, 76 N.J. 127, 144-45, 386 A.2d 378 (1978).
The trial court's highly detailed articulation of reasons for imposing the extended sentence fully comported with the standards adopted by our Supreme Court in State v. Dunbar, 108 N.J. 80, 527 A.2d 1346 (1987). Contrary to defendant's claim, the trial court did not "double-count" aggravating factors. As pointed out by Judge Messina, the cruelty and violence of the attack and the serious nature of the harm inflicted went well beyond the elements that must be established to support a conviction for first degree robbery and second degree aggravated assault. Further, the trial court properly identified and weighed the applicable aggravating and mitigating factors and was clearly convinced that a lengthy period of parole ineligibility was appropriate. We find no basis to interfere with the trial court's exercise of discretion.
Finally, we have considered the arguments advanced in defendant's pro se supplemental brief, including his contention that he was denied a speedy trial. We find no basis for any of these contentions.
Affirmed.