**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4873-18

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JIMMY L. KEARNEY, a/k/a
JIMMY LEE KEARNEY,

    Defendant-Appellant.

_____

Argued November 3, 2021 – Decided December 10, 2021

Before Judges Fisher and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 17-02-0153.

Elizabeth C. Jarit, Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Elizabeth C. Jarit, of counsel and on the briefs).

Michele C. Buckley, Assistant Prosecutor, argued the cause for respondent (James O. Tansey, First Assistant Prosecutor, Designated Prosecutor for purpose of this appeal, attorney; Michele C. Buckley, of counsel and on the brief).

PER CURIAM

After defendant unsuccessfully moved in the trial court to suppress statements he made to police during the course of three interviews, defendant pleaded guilty to first-degree felony murder, while reserving the right to appeal the denial of his suppression motion. The trial judge sentenced Kearney to a thirty-year term of imprisonment, with a thirty-year term of parole ineligibility. Defendant appeals the order denying his suppression motion, arguing, among other things, that he made multiple invocations of his right to remain silent that the police failed to honor. We find no merit in defendant's arguments and affirm.

I

During the morning of October 31, 2016, police officers responded to reports of a man suffering from a gunshot wound on Walnut Street in Elizabeth. They obtained video surveillance footage from a nearby shop that depicted the victim, Robert Rouse, walking down Walnut Street, and a second unidentified individual, who had just exited a Walnut Street residence, walking behind him. The video depicted Rouse and the other exit the frame and, shortly thereafter, the latter came back into frame and returned to the residence he had exited shortly before. A few moments later, the unidentified individual again exited the

2

residence, walked towards the scene of Rouse's shooting, and returned to the residence. The fatal shooting itself was not captured on the video.

Focusing on the unidentified individual in the video and the residence he entered and exited, police officers closed off traffic and watched the residence to ensure no one departed.

Later that morning, officers obtained a warrant to search the residence, a home consisting of four apartments with two main entrances, both on Walnut Street. All four apartments were occupied by members of defendant's immediate and extended family. The warrant permitted a no-knock entry and the seizure of physical evidence related to the shooting and robbery of Rouse.

Around noontime, officers entered one of the first-floor apartments and detained the male occupants, including defendant, with handcuffs, after initially holding them at gunpoint, while they secured the residence. Once the residence was secured thirty minutes later, officers removed the handcuffs from the male occupants, and detectives requested that the residence's occupants go with them to the prosecutor's office for questioning.

The occupants accompanied detectives to the prosecutor's office. Defendant and his uncle were transported, unrestrained, in the back of an unmarked police vehicle. Defendant's sister and Yvonne Grant, his

grandmother,[1] drove separately in the former's personal vehicle. Other family members were transported, unrestrained, in another police vehicle.

Once at the prosecutor's office, defendant and his family members were led to a waiting room and instructed to wait until called for an interview by detectives. They were not permitted to leave or even use the restroom without an escort.

<u>Defendant's First Interview</u>. At approximately 1:06 p.m., Detectives Danika Ramos and Juan Velarde began their first interview of defendant. He was not informed of his <u>Miranda</u>[2] rights prior to this interview. Defendant told Detective Ramos he was not there voluntarily but was there only because officers "made [him] come here." When Detective Ramos asked if defendant ever told officers he did not want to go to the prosecutor's office, he responded "if they gave me the choice, I would of never been here."

Detectives initially asked defendant his name, date of birth, employment status, familial relations, and his residence's inhabitants. They asked if

---

[1] Throughout the proceedings, both defendant and his sister referred to her as their grandmother, although Yvonne Grant clarified in her testimony that she is actually their aunt. We will refer to her in this opinion as defendant's grandmother.

[2] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

defendant attended school, and whether he had school that day. Defendant told detectives he attended West Caldwell High School, and he did have school that day but "woke up late."

At 1:14 p.m., Detective Ramos abruptly stopped the interview when Sergeant Jose Vendas, who was monitoring the interview from another room, knocked on the door. Sergeant Vendas had learned that other officers found a handgun in defendant's bedroom closet. With that Detective Ramos presented defendant with a <u>Miranda</u> waiver form and asked him to read it aloud. Defendant complied and agreed to its stipulations, even receiving an explanation of the word "coercion" from detectives prior to signing at 1:18 p.m. Detective Ramos then asked defendant if he "[w]ould . . . like to speak to us," to which defendant replied, "[y]ea I'm gonna speak to you ya for now."

Defendant responded to questioning that he typically woke up for school at 6:00 a.m., but his alarm did not sound that morning, so he did not wake up until his grandmother woke him at approximately 8:00 a.m. and that he did not leave the residence prior to that. He claimed he arrived home the previous evening between midnight and 1:00 a.m., and did not leave thereafter. He claimed he heard a gunshot when he returned home the previous evening, but thought it was a firecracker.

A-4873-18

Detective Ramos asked defendant about his bedroom's layout. When he mentioned a closet, Detective Ramos asked whether officers would find anything in it, and defendant said officers had found "[n]othing" because if they did he "would be in the county [jail]." Detective Ramos asked defendant "what if I told you that [officers] found a gun in the closet," to which defendant responded, "I know they didn't . . . [a]in't no gun in there." Ramos then said officers found a gun in his closet. Defendant denied it. Detectives said, "[i]f you're keeping it for protection it is what it is," but defendant persisted in denying any knowledge about a gun in his closet.

Detectives asked defendant whether anyone else had access to his closet, and he responded that others could access his room. Detectives then asked if he would consent to providing DNA. Defendant asked what would happen if he refused; Detective Ramos said the police would obtain a search warrant. Defendant then read aloud and signed a consent form, giving detectives permission to perform a buccal swab.

Finally, Detective Ramos asked defendant if he had any involvement in the shooting of Rouse. He said "[n]o." Defendant then asked if he could call his grandmother, but Detective Velarde told him he could not use the phone. Defendant professed his innocence and lack of knowledge of the gun in his

6

closet. This first interview ended at 2:25 p.m., and defendant was escorted back to the waiting room, where he was able to confer with his family members.

The Second Interview. At approximately 2:50 p.m., detectives were informed officers found Rouse's bloodstained bag in defendant's bedroom. Defendant was escorted back into the interview room and began speaking with detectives at approximately 3:00 p.m. Detectives asked defendant to read and sign a Miranda waiver form, to which he responded: "[c]an't you just put it with the first one I did please? Like please 'cause I really don't . . . I just filled out hella papers, please?" In lieu of defendant reading and signing another Miranda form, detectives asked defendant to confirm they already advised him of his Miranda rights, and he responded in the affirmative. Detectives asked if defendant would speak to them again, to which he responded, "[y]eah."

Detectives informed defendant that they found items belonging to Rouse in defendant's bedroom. Defendant initially denied knowledge of these items but later claimed someone named Equan came to the residence at approximately 6:00 a.m. and gave him two bags to hold onto. When defendant told detectives conflicting claims about how Equan entered and exited the residence, the detectives explained there was evidence to the contrary. Defendant continued to claim his statements were true. Detectives responded that they did not believe

7

defendant and again asked him to tell the truth, stating: "[tell the truth] [s]o that the assistant prosecutor and the judge look at the statement and they could be like you know what he has feelings. This guy is not a cold blooded murdere[r] he has feelings." Defendant maintained everything he said in this interview was true.

This second interview concluded at 4:00 p.m., when detectives led defendant out of the interview room and formally placed him under arrest.

The Third Interview. At approximately 4:16 p.m., defendant again entered the interview room to speak with detectives. Prior to questioning, defendant was provided with a Miranda form, which he read aloud and signed. Detective Ramos asked defendant if, after his formal arrest, he spoke with detectives about anything, to which he responded, "[y]ea that I was going home." Detective Ramos immediately denied this and asked defendant whether he initiated a conversation with detectives. Defendant confirmed he initiated a conversation with detectives and informed them he wanted to speak with them again.

Defendant told detectives he was walking home that morning at approximately 5:00 a.m. when he saw Rouse's bag in an alley. He claimed he recovered the bag, took it back to the residence, and checked its contents, finding inside $5.75 and a gun. Detectives told defendant they did not believe this story.

A-4873-18

Defendant then claimed that someone named Nassir committed the murder, he (defendant) was not present at the time of the shooting, and Nassir left the bag in the backyard of defendant's residence. When Detective Ramos expressed disbelief, defendant said, "I know whatever I tell ya [aren't] gonna believe. Can I pleas[e] call my grandmother cause I already know ya about to just try to tax me because it's just crazy I'm trying to sit here and tell ya the truth and nobody believes me." He then said, "I wanna go home bro. [T]hat's why I'm telling ya this, bro. I promise you bro." Detectives again told defendant they did not believe him and "[t]he truth is what's gonna help [him] out."

Defendant again claimed his statement about Nassir was truthful and said, "[y]a think I was, I was not there. Ask my grandmother, ask my grandmother. Where my grandmother at. Can I please, can I please get my grandmother here, please. I don't want to talk, I need her my guardian to talk over me. Cause that's my guardian." Detectives explained that defendant did not need a guardian present as he was eighteen-years old, and they continued the interview.

Defendant told detectives he was hesitant to speak about Nassir out of fear for his safety. Defendant claimed that when he witnessed Nassir attempt to rob the victim by brandishing a gun, he turned around, entered the residence, and, once inside, heard a gunshot. Defendant further claimed he received a call from

Nassir telling him the bag was in the backyard and that he retrieved it with the plan to dispose of it.

Prior to ending the interview, Detective Ramos again asked defendant to tell the truth, to which he responded he just did. The third interview concluded at 5:16 p.m.

II

Defendant was indicted and charged with: first-degree murder, N.J.S.A. 2C:11-3; first-degree felony murder, N.J.S.A. 2C:11-3(a)(3); first-degree robbery, N.J.S.A. 2C:15-1(a)(1); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1); and second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1).

Defendant moved to suppress the statements he gave to police described above. During a six-day hearing that occurred on nonconsecutive days starting in October 2017 and ending in May 2018, the judge heard the testimony, among others, of the detectives, as well as defendant's sister, cousin, and grandmother. Defendant did not testify. On February 14, 2019, the judge rendered an oral decision and entered an order denying defendant's motion.

The following month, defendant pleaded guilty to felony murder pursuant to a plea agreement. In accordance with that agreement, defendant was later

sentenced to a thirty-year prison term subject to a thirty-year period of parole ineligibility. The other charges were dismissed.

## III

In appealing the denial of his motion to suppress statements made during the three police interviews, defendant argues the trial judge erred because: (a) the detectives "fail[ed] to provide Miranda warnings"; (b) the detectives "fail[ed] to cease the interrogation after multiple invocations of the right to silence"; (c) "the totality of the circumstances demonstrates that neither the supposed waivers nor statements were knowing, intelligent, or voluntary"; and (d) "the statements were fruit of the unlawful arrests of [defendant] and his entire family." We reject all these arguments.

## A

In considering the first part of defendant's multi-faceted argument, we recognize that the right against self-incrimination is "[o]ne of the most fundamental rights protected by both the Federal Constitution and state law." State v. O'Neill, 193 N.J. 148, 167 (2007). To ensure its protection, we are guided by the principle that one who is "subjected to police interrogation while in custody at the station or otherwise deprived of his freedom of action in any

significant way . . . must be adequately and effectively apprised of his rights." Miranda, 384 U.S. at 467, 477.

These rights must be provided prior to any questioning, id. at 479, although it is well established that routine questions associated with booking are ministerial and do not constitute interrogation, State v. Bohuk, 269 N.J. Super. 581, 593 (App. Div. 1994). In addition, "unexpected incriminating statements" made by individuals in custody "in response to non-investigative questions by the police without prior Miranda warnings are admissible," State v. M.L., 253 N.J. Super. 13, 21 (App. Div. 1991), but "generalized discussion relating to [the] investigation" will be viewed as interrogation that must be preceded by Miranda warnings, State v. Bey, 112 N.J. 45, 68 n.13 (1988).

Defendant argues the statements he made in the first eight minutes of the first interview – prior to being advised of his rights – should have been suppressed "[p]ursuant to a straightforward application of Miranda." He contends the judge erred in holding these statements were "somewhat generic in nature" and not interrogative. We disagree; the judge's characterization of the detective's questions in the brief period prior to the giving of Miranda warnings was correct.

In that eight-minute period, defendant was asked his name, address, phone number, date of birth, familial relations, and living situation. He was also asked for the identities of the other individuals living in the four-family home and whether he was employed, the school he attended and the grade he was in. Defendant was lastly asked whether he had "school today," and he said, "I did, I did have school today but I woke up late." With that, the interview was interrupted, and, when resumed, Detective Ramos immediately informed defendant of his <u>Miranda</u> rights.

The absence of a <u>Miranda</u> warning prior to the first eight minutes was not violative of defendant's rights even though defendant was not free to leave. <u>State v. Melendez</u>, 454 N.J. Super. 445, 457-58 (App. Div. 2018). We find no error in the judge's determination that there was no basis to suppress the first eight minutes and reject the contention that the pre-<u>Miranda</u> portion required the suppression of all statements that followed the <u>Miranda</u> warning. <u>See</u> <u>O'Neill</u>, 193 N.J. at 184-85.

B

In considering defendant's second argument, we recognize that an individual's invocation of the right to remain silent must be "scrupulously honored." <u>State v. Johnson</u>, 120 N.J. 263, 282 (1990). And, in instances when

an individual makes a statement that "equivocal[ly] indicat[es]" a desire to remain silent, and police are "reasonably unsure whether the suspect was asserting that right," they should seek to clarify the individual's intentions. Id. at 283.

Defendant argues he invoked his right to remain silent "more than a dozen times" that he lumps into four categories he identifies in his brief as statements that he: wanted to leave; was not there voluntarily; wanted to go home; and wanted to speak to his grandmother. We find no merit in the contention that these were invocations of the right to remain silent or even ambiguous invocations that required police clarification. In rejecting the argument, we are mindful of the Supreme Court's holding that invocation of the right to remain silent "does not have to follow a prescribed script" nor must the individual "utter talismanic words"; individuals "unschooled in the law . . . will often speak in plain language using simple words, not in the parlance of a constitutional scholar." State v. S.S., 229 N.J. 360, 383 (2017). We also recognize that defendant was eighteen years old and in his senior year of high school. The trial judge, however, considered and weighed all these circumstances when determining whether defendant invoked or attempted to invoke his right to remain silent. In deferring to the judge's findings, State v. Gamble, 218 N.J. 412,

424 (2014), as illuminated by our own review of the evidence, we conclude there was ample evidence to support the judge's finding that defendant did not invoke his right to remain silent in the four general ways he now argues.

For example, defendant argues that his statements during the interviews about wanting to go home – "I gotta go home"; "I really want to leave"; I want to "go home"; "I just wanna go home please" – were invocations of his right to remain silent. Considered in context, however, those statements cannot even be equated with an ambiguous invocation. On each occasion, the desire to leave was bracketed by defendant's protestations about the content of the detectives' question, see Moore v. Dugger, 856 F.2d 129, 134 (11th Cir. 1988), as revealed by the following exchange:

> [DEFENDANT]: Evidence, ya ain't got evidence, aight ya don't got evidence I was there.
>
>     . . . .
>
> [RAMOS]: You don't think so.
>
> [VELARDE]: You don't think so.
>
> [DEFENDANT]: I know so cause I wasn't. I know so cause I wasn't.
>
> [VELARDE]: You sure about that?
>
> [DEFENDANT]: I'm positive.

A-4873-18

[VELARDE]: Okay.

[DEFENDANT]: I'm positive. I just wanna go home please. Cause I'm telling ya the truth, I'm positive I was not there bro.

The statement about wanting to go home, in this context – as with the other similar statements – was just something defendant said during his response to the detectives, who were suggesting defendant was present during the shooting; defendant was not even ambiguously asserting a right to remain silent because his requests to go home were uttered along with his affirmative statements about what he claimed had occurred.

The same is true with defendant's requests to speak to his grandmother. Those requests were certainly made but never once, in that context, did defendant either suggest he did not want to speak further or stop speaking to the detectives. See State v. Diaz-Bridges, 208 N.J. 544, 570 (2012). During the third interview, for example, the following took place:

[DEFENDANT]: I'm telling you the truth.

[RAMOS]: I'm not getting it.

[VELARDE]: You're not telling us the truth Jimmy.

[DEFENDANT]: How. So ya think I was there. Come on man.

[VELARDE]: You tell me.

16

[DEFENDANT]: Ya think I was there, I was not there. Ask my grandmother, ask my grandmother. Where my grandmother at. Can I please, can I please get my grandmother here, please. I don't want to talk, I need her my guardian to talk over me. Cause that's my guardian.

In his argument, defendant relies heavily on the statement "I don't want to talk" uttered in the midst of that discussion. Following this exchange, detectives again asked defendant his age, and he responded he was eighteen and lives with his grandmother. Detective Ramos responded that defendant was "an adult," suggesting correctly that the law did not require the involvement of a guardian. Defendant, in persisting about a desire to have his grandmother's involvement however, clearly did not mean this request as an invocation of his right to remain silent; instead, he sought his grandmother's involvement to corroborate the truth of what he was telling the detectives. And in the course of this discussion, he repeated his willingness to speak to the detectives:

[DEFENDANT]: Alright, I want, I want ya to call her so she, so she could approve so she could prove this to ya.

[VELARDE]: Approve, what, what are you talking about?

[DEFENDANT]: Approve that she heard that, when she opened the door for me, she didn't, niggas heard gun shots. After she opened the door for me. Come on

17

please. Please, please call her cause I was not there, please. Please can you call her please. [Phone number provided], please. Please. Cause <u>I'm telling you</u>, I'm not like, bro <u>I'm sitting here trying to tell you the truth</u> and ya nobody wanna believe me bro. I know how this go, ya gonna try and say all this and that and that you trying to break me down trying to make me say it was me. When I'm bro, <u>I'm actually sitting here telling ya</u> it wasn't. [B]ut ya don't wanna go out there and find out who really did it. [B]ut ya here harassing me when it's the nigga who really did it out there fucking walking.

[Emphasis added.]

As can be seen, with this questioning, Detective Velarde clarified what defendant meant in asking that his grandmother be called, again, not to provide counsel but to provide factual support for his contentions. And by his further statements – after asking for his grandmother and after saying "I don't want to talk" – defendant continued to talk, professing his innocence.

For these reasons, we find no reason to disturb the trial judge's ruling – based on his consideration of the testimony adduced at the suppression hearing – that defendant did not invoke his right to remain silent in these or the other ways that defendant now argues in this appeal. To the extent we have not discussed all aspects of defendant's argument, it is because we find insufficient merit in the other facets of this argument to warrant further discussion in a written opinion. <u>R.</u> 2:11-3(e)(2).

## C

We also find no reason to second guess the judge's decision, made after a consideration of the testimony and the video of the interviews, that defendant's statements were knowingly, intelligently, and voluntarily made.

A criminal defendant may waive his right against self-incrimination when the waiver is knowing, intelligent, and voluntary. State v. Nyhammer, 197 N.J. 383, 401-02 (2009). To determine whether a waiver meets this criterion, a court must look to the totality of the circumstances, O'Neill, 193 N.J. at 177, 181; State v. Dispoto, 189 N.J. 108, 124 (2007), and consider such factors as the defendant's "age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved." State v. Presha, 163 N.J. 304, 313 (2000). When challenged, the prosecution must prove a valid waiver beyond a reasonable doubt. Ibid.

Defendant argues his statements did not meet this standard because of: the lack of an initial Miranda warning; his personal characteristics; the detectives' use of deception during the interviews; and the fact defendant was in custody. We have already concluded that the absence of a Miranda warning until eight minutes into the first interview was of no moment, and we have discussed how

19

the trial judge properly considered defendant's age and education in making his determination.[3]

We also find no significance in defendant's refusal to sign another Miranda form at the outset of the second interview, which took place a mere two hours after defendant had already waived his right to remain silent. As the trial judge correctly noted, once a defendant has been advised of his rights, no repetition is required. State v. Melvin, 65 N.J. 1, 14 (1974). Moreover, what happened at the start of the second interview is a far cry from a refusal to waive rights. Rather, defendant acknowledged his rights at that time, specifically requesting that the detectives use his first waiver as a reflection of his willingness to speak to them, see State v. Milledge, 386 N.J. Super. 233, 245 (App. Div. 2006), as revealed by this exchange at the start of the second interview:

> Q. Alright just have a seat over there again. Since we're bringing you back for a couple of . . . . I have to read this again for you. I mean something we have to do because . . .

_____

[3] Defendant admits he was at the age of majority at the time of the interviews; he also had prior experience with the criminal justice system, having had two prior juvenile adjudications. Consequently, his reliance on State ex rel. A.A., 240 N.J. 341, 354 (2020), and the Court's holding, with regard to a fifteen-year-old, that juveniles "are generally more vulnerable to pressure than adults," is misplaced.

A. (inaudible) I got to sign that again?

Q. Yeah because we have to . . .

A. Can't you just put it with the first one I did please? Like please 'cause I really don't . . . I just filled out hella papers, please?

Q. Okay, alright so then let me ask you this. You're aware that you have your rights, right and you read your rights before?

A. Yeah, yeah.

Q. We advised you of your rights, correct?

A. Yeah.

Q. And you are willing to come and speak to us?

A. Yeah.

Q. Again? Yes or no?

A. Yeah.

Q. Okay um just so you know you're under advisement, okay? Just so you know that you're.

A. What is that?

Q. Well so you don't want to sign this but I'm but since we signed this already . . .

A. Oh, oh, oh alright. Yeah, yeah, yeah alright.

Q. Earlier.

21

A-4873-18

A. (inaudible)

Q. Yeah I'm just making sure that you know this still this still is in effect, okay?

A. Alright.[4]

We also reject defendant's claim that he was misled by the detectives as a basis for arguing his waiver was not knowing or voluntary. Defendant contends detectives withheld information, such as the fact that he was a suspect for Rouse's murder, that charges had been approved by the prosecutor, and that a formal complaint was filed with the court during the third interview. Defendant also contends detectives affirmatively lied to him throughout the interviews, claiming they told defendant it would be beneficial for him if he acknowledged his participation.

Defendant, however, overstates what he claims were the detectives' "promises" about leniency. Detectives told defendant he should tell the truth "[s]o that the assistant prosecutor and the judge look at the statement and they could be like you know what he has feelings. This guy is not a cold blooded murdered [sic] he has feelings." This is by no means a promise of leniency as defendant contends. Defendant even acknowledges detectives may not have

---

[4] All the ellipses in this quoted colloquy were inserted by the transcriber.

made express promises, but he argues their insinuations of leniency for truth-telling overbore his will. We reject this. The law does not preclude detectives from "[a]ppealing to [defendant's] sense of decency and urging him to tell the truth for his own sake." State v. Miller, 76 N.J. 392, 405 (1978). Defendant relies on State v. L.H., 239 N.J. 22, 47-48 (2019), arguing that "false promises of leniency . . . are in contravention of the Miranda warnings." In L.H., the Court held a confession was involuntary because detectives told the defendant that telling the truth "w[ould] set [him] free[,]" finding this type of statement "conflicted with the Miranda warning that anything defendant said could be used against him." Id. at 47. We reject defendant's argument because the detectives' statements here have far greater resemblance to what was said in Miller than what was said in L.H.

Defendant also argues that, between his second and third interview, detectives promised he could go home. This is not supported by the record, as revealed by the start of the third interview when Detective Ramos, after again informing defendant of his rights, denied any such thing had been said:

> [RAMOS]: . . . We took you out of the room before. We placed you in handcuffs. Did we speak, speak about anything while you in that, on the bench?
>
> [DEFENDANT]: Yea that I was going home.

23

[RAMOS]: No, no, no we didn't tell you that. Did we speak to you, did we tell you what, you initiated conversation, you told us that you wanted to speak to us again. Is that, am I right or wrong?

[DEFENDANT]: Yea, yea.

Detective Ramos confirmed that it was defendant's desire to speak to detectives again by asking: "You initiated the conversation, you wanted to speak to us. Is that correct?" Defendant replied "[y]ea."

Lastly, there is no evidence of a violation of the principles set forth in State v. A.G.D., 178 N.J. 56 (2003). The judge made a finding that, at the time the third interview began, detectives "did not have in hand a criminal complaint and/or warrant." Defendant offers no evidence to the contrary.

We, thus, conclude that none of the reasons offered by defendant in this appeal requires our intervention or second-guessing of the judge's determination that defendant knowingly, intelligently and voluntarily waived his right to remain silent during the three interviews.

D

Defendant also contends, for the first time in this appeal, that his family's detention had a coercive impact on him that rendered his waiver involuntary. Even assuming defendant's family members were held against their will, defendant has failed to show, through reference to the evidence adduced at the

24

suppression hearing, how this circumstance impacted the voluntariness of his statements. Indeed, not only does the content of the three interviews show defendant was unconcerned about his family's presence outside the interview room, but – as noted earlier – defendant repeatedly asked the detectives to speak to his grandmother as he attempted to rally support for his assertion that he was not present at the shooting. We see no evidence in the record to suggest this as a factor that weighed on defendant's willingness to answer detectives' questions.

* * *

All defendant's other discernible arguments are without sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION